JOHN F. NUTT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

EILEEN M. NUTT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 77669, 77670. Filed October 26, 1962.

*W. Lee McLane, Jr., Esq.,* and *Thaddeus Rojek, Esq.,* for the petitioners.

*Walter S. Weiss, Esq.,* and *Donald D. Winn, Esq.,* for the respondent.

Scott, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows:

| Taxable year ended Dec. 31— | Deficiencies | |
| --- | --- | --- |
| | Docket No. 77669, John F. Nutt | Docket No. 77670, Eileen M. Nutt |
| 1955 | $20,795.45 | $20,699.45 |
| 1956 | 43,060.09 | 42,604.09 |
| 1957 | 38,806.03 | 38,806.04 |

By amendment to answer respondent asserted an alternative position and claimed an increased deficiency for the year 1957 in the case of John F. Nutt in the amount of $8,413.85 and in the case of Eileen M. Nutt in the amount of $8,413.85.

The issues for decision are:

(1) Whether petitioners' sales of land with unharvested crops thereon to Rancho Tierra Prieta, a corporation in which they held all the voting stock, and assignment of leaseholds with unharvested crops thereon to Black Land Farms, Inc., a corporation in which they were the majority stockholders, should be ignored for Federal income tax purposes and the income and expenses attributable to the farming operations on those lands for the years 1955, 1956, and 1957 included in computing petitioners' taxable income.

(2) In the alternative, is section 1231(b)(4) of the Internal Revenue Code of 1954 inapplicable to the transactions, so that the gains realized by petitioners from the sale of unharvested crops to Rancho Tierra Prieta and Black Land Farms, Inc., are taxable to them as ordinary income from the sale of property held primarily for sale to customers in the ordinary course of business?

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Petitioners, John F. Nutt and Eileen M. Nutt, husband and wife residing in Eloy, Arizona, filed separate Federal income tax returns for each of the calendar years 1955, 1956, and 1957 with the district director of internal revenue at Phoenix, Arizona, using the cash receipts and disbursements method of accounting. These returns were filed on a community basis under the community property laws of the State of Arizona.

Petitioner John F. Nutt (hereinafter referred to as petitioner used in the singular) listed his occupation as that of a farmer on his Federal income tax returns for each of the years 1955, 1956, and 1957, and petitioner Eileen M. Nutt (hereinafter referred to as Eileen) listed her occupation as that of housewife on each of her returns for these years.

Petitioner John F. Nutt was 60 years old at the time of the trial of this case. He has been engaged in the farming business in an area south of the town of Eloy, Pinal County, Arizona, continuously since 1935, raising principally cotton, wheat, barley, and maize.

On their tax returns for the taxable years 1955, 1956, and 1957 petitioners reported on a community basis gross farm income from farm crops in the following amounts.

| Crop | 1955 | 1956 | 1957 |
|---|---|---|---|
| Cotton | $104,600.46 | $50,574.60 | $10,846.72 |
| Wheat | 61,323.75 | 13,160.53 | |
| Barley | 12,369.20 | 1,521.92 | |
| Maize | 14,555.24 | 21,814.50 | |
| Grains | | | [1] 43,966.71 |
| Total | 192,848.65 | 87,071.55 | 54,813.43 |

[1] Not otherwise described on returns.

The area in which the farms operated by petitioner were located is basically a desert area with temperatures in the summertime occasionally exceeding 110 degrees. All of the crops raised in this area are irrigated crops. No reliance is placed on natural rainfall as a water supply for farm purposes. Irrigation wells are the principal source of water for farming purposes.

As of December 31, 1955, 1956, and 1957, petitioners had investments in irrigation wells and pumping equipment in total amounts of $128,651.25, $98,589.25, and $92,249.25, respectively.

Petitioner in operating his farms used tractors, planters, cultivators, and other farm equipment. As of December 31, 1955, 1956, and 1957, petitioner had investments in farm machinery and equipment in total amounts of $79,349.92, $74,045.61, and $32,886.07, respectively.

In the area south of Eloy, Arizona, cotton is generally planted in March or April and is harvested in the late fall and early winter. The first picking of cotton generally begins about the middle of September, with the picking operations continuing through January or February of the following year.

Petitioner frequently delivered his cotton for ginning to gins owned by Anderson, Clayton & Co. with whom he had dealt since 1935 and from whom he frequently obtained loans to finance his farm operations.

At the beginning of the 1955 cotton crop year, petitioners owned approximately 2,400 acres of farmland south of Eloy, Arizona, located in Sections 8, 17, 19, 20, 29, and 30, Township 8 South, Range 8 East of the Gila and Salt River meridian, Pinal County, Arizona.

In addition petitioner held leases on farm acreage which he operated at the beginning of the 1955 cotton crop year, as follows:

| Lessor | Property and acreage | Duration of lease |
|---|---|---|
| Dorothy Zook | E½ Sec. 17, T8S, R8E, 320 acres | Feb. 1, 1954, to Feb. 4, 1957. |
| Fidel Salazar | E 1051′ of SW¼, Sec. 19, T8S, R8E, 63 acres | Jan. 1, 1954, to Jan. 1, 1956. |
| Henry Wagner | Part of Sec. 19, T8S, R8E, and part of Sec. 30, T8S, R8E, 63 acres. | Jan. 1, 1954, to Jan. 1, 1956. |
| Henry Wagner | Sec. 24, T8S, R7E, 640 acres | Jan. 1, 1954, to Jan. 1, 1956. |
| Frances Nutt | Part of E½ of Sec. 7, T8S, R8E, 200 acres | Jan. 1, 1951 to Dec. 31, 1953, extended to Dec. 31, 1955. |

The farmlands owned in fee by petitioners and the leases held by petitioner formed a nearly contiguous tract of farm acreage which, at the beginning of the 1955 cotton crop year and in earlier years, was operated by petitioner as a unit.

During the years 1955, 1956, and 1957 petitioners' home was located in the northwest quarter of Section 29, Township 8 South, Range 8 East in Pinal County, Arizona, which location was included in the nearly contiguous tract of farm acreage operated by petitioner.

Petitioners' business office was located in a quonset hut approximately 75 feet south of petitioners' home. Petitioners' books and records were located at this office. Since 1951 petitioners have engaged Norman C. Nupen (hereinafter referred to as Nupen) in the capacity of bookkeeper and accountant.

At the beginning of the 1955 cotton crop year, the acreage operated by petitioner was constituted, by the Department of Agriculture, into two farms. The Department of Agriculture had designated these two farms as Farm 1303 and Farm 1012. Farm 1303 consisted of the lease held by petitioner from Henry Wagner covering Section 24, Township 8 South, Range 7 East and also included the Southwest quarter of Section 19, Township 8 South, Range 8 East. Farm 1012 consisted of all other farm acreage owned or leased by petitioners in Pinal County, Arizona, located in Sections 7, 8, 17, 19, 20, 29, and 30, Township 8 South, Range 8 East. During the years 1955, 1956, and 1957, Farm 1303 and Farm 1012 remained constituted as they were constituted at the beginning of the 1955 cotton crop year.

Separate crop allotments were granted by the Department of Agriculture for Farm 1303 and Farm 1012. The separate cotton crop allotments for the crop years 1955, 1956, and 1957 for Farm 1012 and Farm 1303 were as follows:

| Crop year: | Acres of cotton allotment |
|---|---|
| *Farm No. 1012* | |
| 1955 | 1434. 3 |
| 1956 | 1433. 5 |
| 1957 | 1433. 5 |
| *Farm No. 1303* | |
| 1955 | 99. 6 |
| 1956 | 119. 5 |
| 1957 | 108. 1 |

The cotton allotment granted to farm operators by the Department of Agriculture determines the number of acres of cotton which a farmer may grow without incurring penalties under the rules of the Department of Agriculture. The allotment also determines the extent to which the farmer's cotton will be eligible for price supports under the commodity price support programs administered by the Department of Agriculture. The cotton planted under the allotment must be physically planted on the acreage for which the allotment is granted.

On August 25, 1955, a corporation known as Rancho Tierra Prieta (hereinafter referred to as Rancho) was incorporated under the laws of the State of Arizona.

The incorporators of Rancho were petitioners, Nupen, and Charles N. Walters, an attorney with offices in Phoenix, Arizona. Article III of Rancho's articles of incorporation provided, among other purposes

stated therein, that the general purpose for which Rancho was formed was to engage in the business of farming. The total authorized capital stock of Rancho consisted of 9,000 shares of common voting stock having a stated par value of $100 per share and 1,000 shares of preferred nonvoting stock having a stated par value of $100 per share. The total number of issued and outstanding shares of the stock of Rancho to date is as follows:

| Stockholder | Class of stock | Number of shares | Date issued, Aug. 26— |
|---|---|---|---|
| Petitioner | Common voting | 75 | 1955 |
| Eileen | Common voting | 75 | 1955 |
| Nupen | Preferred nonvoting | 1 | 1955 |
| Charles N. Walters | Preferred nonvoting | 1 | 1955 |

The officers of Rancho from the date of incorporation to date have been petitioner, president, and Eileen, vice president-secretary-treasurer. The directors of Rancho from the date of incorporation to date have been petitioner, Eileen, and Nupen.

Since its inception, Rancho has kept and maintained a set of books and records, and has reported, for Federal and State income tax purposes, the income reflected therein. These books and records were kept and maintained, and Rancho's Federal income tax returns filed, on the cash basis of accounting for fiscal years ended May 31. The first taxable period extended from August 26, 1955, to May 31, 1956, and Rancho filed a Federal income tax return for this period and for the fiscal years ended May 31, 1957, and May 31, 1958, with the district director of internal revenue at Phoenix, Arizona. These returns showed net income and tax due as follows:

| Taxable period | Net income | Tax due |
|---|---|---|
| Aug. 26, 1955–May 31, 1956 | $7,388.25 | $2,216.47 |
| Fiscal year ended May 31, 1957 | 4,136.63 | 1,240.99 |
| Fiscal year ended May 31, 1958 | 18,633.96 | 5,503.14 |

Since its inception, Rancho has held, at regular intervals, meetings of its board of directors and of its shareholders. A record of the business conducted at such meetings has been maintained in the form of minutes kept in a corporate minute book.

On August 30, 1955, petitioners conveyed by warranty deed approximately 1,142 acres of land located in Pinal County, Arizona, to Rancho. This deed was recorded in Pinal County, Arizona, on August 31, 1955. At the time of conveyance the 1,142 acres were planted in cotton, none of which crop had been harvested by August 30, 1955. The agreed consideration for the land with the growing crop thereon was $324,933.13. Of this $324,933.13, the sum of $92,660

represented the fair market value of the land and $232,273.13 represented the fair market value of the crop growing thereon as appraised by Western Farm Management Company, Phoenix, Arizona. There was no time during the calendar year 1955 when some crop was not growing on this land. Neither the deed nor the agreement of August 30, 1955, between petitioners and Rancho respecting payment contained a provision granting to petitioners an option to reacquire the land conveyed.

Subsequent to August 30, 1955, petitioner notified Western Cotton Products Company, a division of Anderson, Clayton & Co., which held mortgages on the cotton crop growing on the land conveyed to Rancho of the conveyance. The crop mortgages were paid thereafter by petitioner.

The written agreement of August 30, 1955, between petitioners and Rancho provided for payment to petitioners by Rancho of $1,000 in cash and the balance by notes secured by mortgages on the land and crops. The mortgages given by Rancho to petitioners on the land and crops were recorded in Pinal County, Arizona, on August 31, 1955. The following sums were paid by Rancho to petitioners in payment of the consideration set forth in this written agreement:

| Date 1955 | Initial payment | Payments on land mortgage | Payments on crop mortgage | Total payments |
|---|---|---|---|---|
| Aug. 30 | $1,000 | | | |
| Nov. 16 | | | $20,000.00 | |
| Dec. 5 | | | 3,000.00 | |
| Dec. 27 | | $21,000 | 37,000.00 | |
| | 1,000 | 21,000 | 60,000.00 | |
| Total of payments made in 1955 | | | | $82,000.00 |
| 1956 | | | | |
| Jan. 10 | | 39,000 | 91,000.00 | |
| Mar. 10 | | | 3,000.00 | |
| July 5 | | | 1,500.00 | |
| July 23 | | | 10,500.00 | |
| Nov. 12 | | | 38,000.00 | |
| Nov. 23 | | | 27,000.00 | |
| | | 39,000 | 171,000.00 | |
| Total of payments made in 1956 | | | | 210,000.00 |
| 1957 | | | | |
| June 27 | | 13,500 | 773.13 | |
| Oct. 11 | | 18,660 | | |
| | | 32,160 | 773.13 | |
| Total of payments made in 1957 | | | | 32,933.13 |
| | | | | 324,933.13 |

On August 20, 1956, petitioners conveyed by warranty deed 942.5 acres of land located in Pinal County, Arizona, to Rancho. This

deed was recorded in Pinal County, Arizona, on August 21, 1956. At the time of the conveyance the 942.5 acres were planted in cotton, none of which crop had been harvested by August 20, 1956. The agreed consideration for the land with the crop growing thereon was $273,553.75. Of this $273,553.75, the sum of $72,210 represented the fair market value of the land and $201,343.75 represented the fair market value of the crop thereon as appraised by Western Farm Management Company. There was no time during the calendar year that there was not some crop growing on these 942.5 acres of land. Neither the deed nor the agreement between petitioners and Rancho as to payment granted to petitioners an option to reacquire the 942.5 acres.

Subsequent to August 20, 1956, petitioner notified Western Cotton Products Company, a division of Anderson, Clayton & Co., which held mortgages on the cotton crop growing thereon of the conveyance to Rancho and the crop mortgages were thereafter paid by petitioner.

The following sums were paid by Rancho to petitioners in payment of the agreed consideration set forth in the written agreement of August 20, 1956, between Rancho and petitioners, which agreement provided for a cash payment of $1,000 and notes to be given for the balance of the stated consideration secured by mortgages on the land and crops, which mortgages were recorded in Pinal County, Arizona, on August 21, 1956.

| Date 1956 | Initial payment | Payments on land mortgage | Payments on crop mortgage | Total payments |
|---|---|---|---|---|
| Aug. 20 | $500 | | | |
| Aug. 20 | 500 | | | |
| Oct. 25 | | | $30,000.00 | |
| Nov. 12 | | $5,500 | 34,500.00 | |
| | 1,000 | 5,500 | 64,500.00 | |
| Total of payments made in 1956 | | | | $71,000.00 |
| *1957* | | | | |
| Jan. 7 | | | 60,000.00 | |
| June 27 | | 6,000 | 64,000.00 | |
| Sept. 26 | | | 12,343.75 | |
| | | 6,000 | 136,343.75 | |
| Total of payments made in 1957 | | | | 142,343.75 |
| | | | | 213,343.75 |

Rancho filed annual reports with the Arizona Corporation Commission for 1956, 1957, and 1958.

Rancho opened two checking accounts (a general account and a picking account) with the First National Bank of Arizona and carried these accounts with this bank during the period August 26, 1955, to December 31, 1957, inclusive.

Government authorization to contract for Mexican national workers was applied for and received by Rancho.

During 1955 and 1956 Mexican national workers were employed by Rancho to aid in harvesting its cotton crop. These employees were paid by checks drawn on the picking account of Rancho carried with the First National Bank of Arizona.

During the years 1955 through 1957 Rancho employed on a permanent basis an average of about 10 employees. These employees were paid by checks drawn on the account of Rancho carried with the First National Bank of Arizona.

During the years 1955, 1956, and 1957 Rancho made Social Security payments and payments to the Industrial Commission of Arizona and filed reports accompanying such payments.

During the years 1955, 1956, and 1957 Rancho retained the services of Alexander Grant & Company, a firm of certified public accountants, to prepare and file its Federal and State income tax returns.

In 1957 Rancho received a soil-bank payment in the amount of $135,107.45 from the Commodity Credit Corporation.

Real property taxes were paid to the treasurer of Pinal County by Rancho during the years 1956 and 1957 on the real property which had been conveyed to it by petitioners.

During the 1955 and 1956 cotton crop years, Rancho carried a ginning account with Western Cotton Products Company and received invoices and gin statements of account from this ginning company respecting cotton ginned in the name of Rancho.

During December 1955 and January 1956, Rancho warehoused baled cotton in its name with the Federal Compress and Warehouse Company, Arizona Compress and Warehouse Company, and Western Compress Company and received receipts in its name therefor.

During the 1955 and 1956 cotton crop years, Rancho entered into loan agreements with the Commodity Credit Corporation and received notes and loan statements in connection with loans from the Commodity Credit Corporation.

During the 1956 and 1957 grain crop years, Rancho carried a grain account with Western Cotton Products Company and received statements of account respecting grain harvested and delivered to that company.

During the 1956 grain crop year Rancho delivered harvested grain to Arizona Flour Mills which issued to Rancho a grain ledger sheet respecting these deliveries.

During the 1957 crop year Rancho procured a loan pledging the maize crop as collateral therefor. After harvesting, a further loan was procured on the warehoused portion of the 1957 maize crop.

During the years, 1955, 1956, and 1957 Rancho drew checks on its account with the First National Bank of Arizona in payment of expenses and expenses were paid for the account of Rancho by one of the gins which ginned cotton brought to it in Rancho's name.

On August 27, 1955, a corporation known as Black Land Farms, Inc. (hereinafter referred to as Black Land), was incorporated under the laws of the State of Arizona.

The incorporators of Black Land were petitioners and Frances D. Nutt (hereinafter referred to as Frances), petitioners' adult daughter. Article III of the articles of incorporation of Black Land provided, among other purposes stated therein, that the general purpose for which the corporation was formed was to engage in the business of farming. The total authorized capital stock of Black Land consisted of 10,000 shares of common stock having a stated par value of $100 per share. The total number of issued and outstanding shares of the stock of Black Land to date is as follows:

| Stockholder | Class of stock | Number of shares | Date issued Aug. 29— |
|---|---|---|---|
| Petitioner | Common | 40 | 1955 |
| Eileen | Common | 39 | 1955 |
| Frances | Common | 21 | 1955 |

The officers of Black Land from the date of incorporation to date have been petitioner, president; Frances, vice president; and Eileen, secretary-treasurer. The directors of Black Land from the date of incorporation to date have been petitioners and Frances.

Since its incorporation Black Land has kept and maintained a set of books and records and has reported, for Federal and State income tax purposes, the income reflected therein. These books and records were kept and maintained on the cash basis of accounting, and Black Land's Federal income tax returns were filed on this basis and for fiscal years ended August 31, its first return being for the fiscal year ended August 31, 1956. Its Federal income tax returns for its fiscal years ended August 31, 1956, 1957, and 1958, were filed with the district director of internal revenue at Phoenix, Arizona. The income tax returns showed net income and tax due as follows:

| Fiscal year ended Aug. 31— | Net income | Tax due |
|---|---|---|
| 1956 | [1]($19,977.26) | None |
| 1957 | [2] 44,660.17 | $7,404.87 |
| 1958 [3] | [1](12,964.42) | None |

[1] Loss.
[2] Prior to deduction of net operating loss carryover of $19,977.26.
[3] This was a "soil bank year" and no crops were planted on the leaseholds assigned to Black Land, its only reported income being a soil bank payment.

Since its inception Black Land has held, at regular intervals, meetings of its board of directors and of its stockholders. A record of the business conducted at such meetings has been maintained in the form of minutes kept in a corporate minute book.

Petitioner entered into the following leases on the dates, with the lessors of the property, for the considerations, and for the periods indicated:

| Dates | Lessor | Property | Consideration | Duration |
|---|---|---|---|---|
| Dec. 8, 1953____ | Dorothy Zook_____ | E½ Sec. 17, T8S, R8E, 320 acres. | $13,000_____ | Feb. 1, 1954, to Feb. 4, 1957. |
| Jan. 1, 1954_____ | Fidel Salazar_____ | E 1051′ of SW¼ Sec. 19, T8S, R8E, 63 acres. | $1,890_____ | Jan. 1, 1954, to Jan. 1, 1956. |
| Jan. 1, 1954_____ | Henry Wagner_____ | Sec. 19, T8S, R8E, and part of Sec. 30, T8S, R8E, 63 acres. | $1,800_____ | Jan. 1, 1954, to Jan. 1, 1956. |
| Jan. 1, 1954_____ | Henry Wagner_____ | Sec. 24, T8S, R7E, 640 acres. | $45 per acre per year for cotton land; $20 per acre for wheat land. | Jan. 1, 1954, to Jan. 1, 1956. |
| Dec. 30, 1950___ | Frances_____ | Part of E½ of Sec. 7, T8S, R8E, 200 acres. | $30,000_____ | Jan. 1, 1951, to Dec. 31, 1953, extended to Dec. 31, 1955. |

On August 30, 1955, petitioners assigned these leaseholds to Black Land. At the time of this assignment of leaseholds, there were unharvested crops growing on the land, none of which had been harvested by August 30, 1955. The agreed consideration for the leaseholds of the land upon which the unharvested crops were growing was $97,856.87. The assignment was executed pursuant to an agreement dated August 30, 1955. Of the $97,856.87 consideration for the assignment, the sum of $94,656.87 represented the fair market value of the unharvested crop and $3,200 represented the fair market value of the unexpired leases as appraised by Western Farm Management Company. Petitioners received a $1,000 cash payment and a note for the balance due secured by a mortgage on the crops on the leaseholds, which mortgage was recorded in Pinal County, Arizona, on August 31, 1955.

Subsequent to August 30, 1955, petitioner notified Western Cotton Products Company, a division of Anderson, Clayton & Co., which held mortgages on the cotton crops growing on the leased land covered by the assignments, that the leaseholds had been sold and assigned to Black Land. The crop mortgages were paid thereafter by petitioner.

The following sums were paid by Black Land to petitioners pur-

suant to the terms of the written agreement for sale of leaseholds dated August 30, 1955:

| Date 1955 | Payment |
|---|---|
| Aug. 30 | $1,000.00 |
| Nov. 30 | 9,000.00 |
| Dec. 27 | 18,000.00 |
| Total payments made in 1955 | 28,000.00 |
| *1956* | |
| Jan. 10 | 35,500.00 |
| Feb. 21 | 5,000.00 |
| Mar. 10 | 3,500.00 |
| June 13 | 1,000.00 |
| July 5 | 1,000.00 |
| July 23 | 1,000.00 |
| Nov. 23 | 15,800.00 |
| Total payments made in 1956 | 62,800.00 |
| *1957* | |
| June 30 | 7,056.87 |
| Total payments made in 1957 | 7,056.87 |

Black Land filed annual reports with the Arizona Corporation Commission for 1956, 1957, and 1958.

Black Land opened a general checking account with the First National Bank of Arizona, Phoenix, main office, and carried this account with this bank during the period August 29, 1955, to November 9, 1955, inclusive.

Black Land opened a general checking account with the First National Bank of Arizona, Eloy branch, and carried this account with this bank during the period September 30, 1955, to December 31, 1957, inclusive.

In 1957 Black Land received a soil bank payment in the amount of $43,650 from the Commodity Credit Corporation.

During the years 1955, 1956, and 1957 Black Land employed one or two employees on a permanent basis and migrant farm labor and Mexican national workers on a temporary basis to aid in harvesting crops. These employees were paid by checks drawn on the account of Black Land carried with the First National Bank of Arizona.

During the years 1955, 1956, and 1957 Black Land made Social Security payments and payments to the Industrial Commission of Arizona and filed reports accompanying such payments.

During the years 1955, 1956, and 1957 Black Land retained the services of Alexander Grant & Company, a firm of certified public accountants, to prepare and file its Federal and State income tax returns.

During the years 1955, 1956, and 1957 Black Land drew checks on its account with the First National Bank of Arizona in payment of expenses.

During the 1955 and 1956 cotton crop years a ginning account with Western Cotton Products Company was carried in the name of Black Land and it received invoices and statements of account from the ginning company respecting cotton ginned in its name.

During December 1955 baled cotton was warehoused with the Federal Compress and Warehouse Company and with Western Compress Company in the name of Black Land and receipts for this cotton issued to it.

During the 1955 and 1956 cotton crop years Black Land entered into loan agreements with the Commodity Credit Corporation and received notes and loan statements in connection with such loans.

The agreement between petitioners and Rancho with respect to the sale of real property and unharvested crops expressly stated that Rancho did not purchase any farm machinery, wells, pumps, or pumping equipment. The agreement further provided that petitioners would sell water for irrigation purposes to Rancho in certain specified amounts per year at a stated price for a period of 5 years. The expenses incurred by petitioners prior to August 30, 1955, in planting and growing the unharvested cotton on the land conveyed to Rancho by the deed dated August 30, 1955, were in a total amount of $112,597.

The first picking operations of the cotton crops on the land conveyed by petitioners to Rancho on August 30, 1955, commenced on September 13, 1955. The picked cotton was delivered to cotton gins of Anderson, Clayton & Co. for ginning.

The expenses incurred by petitioners prior to August 30, 1955, in planting and growing the unharvested crops located on the land covered by the leases assigned by petitioners to Black Land were in a total amount of $32,715.09.

The first picking of the cotton crops which had been growing on the land covered by the leases assigned by petitioners to Black Land on August 30, 1955, commenced on September 20, 1955. This picked cotton was delivered to cotton gins owned by Anderson, Clayton & Co. for ginning.

The agreement between petitioners and Rancho dated August 20, 1956, with respect to the sale of real property and unharvested crops expressly stated that Rancho did not purchase any farm machinery, wells, pumps, or pumping equipment. The agreement further provided that petitioners would sell water for irrigation purposes to Rancho in certain specified amounts per year at a stated price for 5 years.

The expenses incurred by petitioners prior to August 20, 1956, in the planting and growing of cotton on the land conveyed to Rancho by deed dated August 20, 1956, were in a total amount of $100,217.12.

The first picking of the cotton crops on the land conveyed by petitioners to Rancho on August 20, 1956, commenced on September 1, 1956. The picked cotton was delivered to cotton gins owned by Anderson, Clayton & Co. for ginning.

The business offices of Rancho and Black Land were both located in the same quonset hut as were petitioners' individual offices.

Petitioner, as president of Rancho, made all of the business decisions respecting the affairs of that corporation.

Nupen served as accountant for Rancho and Black Land.

The address of petitioners, Rancho, and Black Land, as shown on their Federal income tax returns for the years at issue herein, was P.O. Box 938, Eloy, Pinal County, Arizona. All of the income tax returns for the years here involved for both of petitioners were prepared by Alexander Grant and Company, Phoenix, Arizona, which firm prepared all the corporate returns for Rancho and Black Land.

Neither Black Land nor Rancho owned any farm equipment, machinery, irrigation wells, pumps, or pumping equipment during the calendar years 1955, 1956, and 1957.

The two leases from Henry Wagner and the lease from Fidel Salazar, which were assigned by petitioners to Black Land on August 30, 1955, each expired on January 1, 1956. These three leases were renewed by petitioner in his individual name.

Local creditors supplying farm supplies, fertilizer, and grain were sometimes unaware of the existence of Rancho and continued to bill petitioner individually by invoice for such supplies, fertilizer, and grain even though such expenses were charged on the books of Rancho and paid by check of Rancho and related to farm operations conducted on land held in the name of Rancho.

By letter dated September 19, 1955, Rancho advised the Agricultural Stabilization Committee, Pinal County, Casa Grande, Arizona, that it had acquired the land conveyed by petitioners to Rancho on August 30, 1955. The letter, signed by petitioner as president of Rancho, contained the following statement:

I understand that this land is now a part of the farm on which your records show that John F. Nutt is the operator. It is my desire that they remain as they are presently set up and not be reconstituted.

A letter containing a similar statement was sent to the Agricultural Stabilization Committee by Black Land concerning the leases assigned to Black Land by petitioners on August 30, 1955. This letter was also signed by petitioner as president of Black Land and was dated September 19, 1955.

These letters addressed to the Agricultural Stabilization Committee are part of the official records of the Department of Agriculture regarding Farms 1012 and 1303 in Pinal County which records are located in the Agricultural Stabilization and Conservation Office, Casa Grande, Pinal County, Arizona. That office is charged with the local administration in Pinal County of the regulations of the Department of Agriculture regarding such matters as crop allotments, reconstitution of "farms," and price support programs.

On February 16, 1955, petitioner executed two instruments, both of which were entitled "Crop and Chattel Mortgage," in favor of Anderson, Clayton & Co. to secure planting advances in the principal sums of $183,680 and $12,800. The property of petitioner covered by these two crop and chattel mortgages included both specified farm machinery and all cotton, grain, and other crops standing, planted, or grown on certain described real property in Pinal County, Arizona, during the 1955 crop year. On February 16, 1955, petitioner also entered into two contracts with Anderson, Clayton & Co. which were entitled "Business Agreements." Under these agreements petitioner agreed that he would plant, grow, care for, irrigate, and harvest in a good and farm-like manner not less than 1,535 acres of cotton during the 1955 cotton crop year on the lands in Pinal County, Arizona, covered by the crop and chattel mortgages executed the same date. Under the business agreements petitioner promised to deliver the cotton, when harvested, to the gin or gins designated by Anderson, Clayton & Co. Petitioner promised to pay the current rates for ginning, bagging, storage, and other services rendered at the gins so designated. Under the business agreements petitioner also agreed to sell to Anderson, Clayton & Co. all cottonseed derived from petitioner's cotton at the prevailing market price for such cottonseed. Petitioner also granted to Anderson, Clayton & Co. the option to purchase, at the prevailing market price, all cotton delivered at its gin.

The cotton crops covered by the crop and chattel mortgages and the business agreements executed between petitioner and Anderson, Clayton & Co. on February 16, 1955, included the unharvested crops on the land conveyed by petitioners to Rancho under the agreement of August 30, 1955, and also the unharvested crops growing on the lands covered by the leases assigned by petitioners to Black Land under the agreement dated August 30, 1955. There is no mention in the agreement between petitioners and Rancho dated August 30, 1955, or in the agreement between petitioners and Black Land dated August 30, 1955, of the existence of the prior outstanding crop and chattel mortgages or business agreements which petitioner had executed in favor of Anderson, Clayton & Co. on February 16, 1955.

On February 13, 1956, petitioner executed two instruments, both of which were entitled "Crop and Chattel Mortgage," in favor of Anderson, Clayton & Co. to secure planting advances in the principal sums of $140,285 and $7,030. The property of petitioner covered by these two crop and chattel mortgages included both specified farm machinery and all cotton, grain, and other crops standing, planted, or grown on certain described real property in Pinal County, Arizona, during the 1956 crop year. On February 13, 1956, petitioner also entered into two contracts with Anderson, Clayton & Co. which were entitled "Business Agreements." Under the agreements petitioner agreed that he would plant, grow, care for, irrigate, and harvest in a good and farm-like manner all crops, the production of which was financed by Anderson, Clayton & Co. during the 1956 cotton crop year on the lands in Pinal County, Arizona, covered by the crop and chattel mortgages executed the same date. Under the business agreements petitioner promised to deliver any seed cotton produced on these lands to the gin or gins designated by Anderson, Clayton & Co. Petitioner also agreed to pay the current rates for ginning, bagging, storage, and other services rendered at the gins so designated. Under the business agreements petitioners also agreed to sell to Anderson, Clayton & Co. all cottonseed derived from petitioner's cotton at the prevailing market price for such cottonseed. Petitioner also granted to Anderson, Clayton & Co. the option to purchase, at the prevailing market price, all cotton delivered to its gin.

The crops covered by the crop and chattel mortgages and business agreements executed between petitioner and Anderson, Clayton & Co. on February 13, 1956, included the unharvested crops growing on the land conveyed by petitioners to Rancho under the agreement dated August 20, 1956. There is no mention in the agreement between petitioners and Rancho dated August 20, 1956, of the existence of the prior outstanding crop and chattel mortgages and business agreements executed by petitioner in favor of Anderson, Clayton & Co. on February 13, 1956.

In 1956 and 1957 Rancho executed crop and chattel mortgages in favor of Anderson, Clayton & Co. to secure planting advances made by Anderson, Clayton & Co. to Rancho. These crop and chattel mortgages included as security farm machinery which was owned by petitioner, individually, and not by Rancho. These crop and chattel mortgages were executed in the name of Rancho by petitioner as president and Eileen as secretary. In addition to the crop and chattel mortgages, a promissory note was executed in favor of Anderson, Clayton & Co. to secure the advances made to Rancho. These promissory notes executed in 1956 and 1957 were signed by petitioners, both as officers of Rancho and individually as guarantors. Anderson, Clayton & Co.

would not have made such advances without the personal guarantee of petitioner.

In their separate Federal income tax returns for the taxable years 1955, 1956, and 1957 petitioners reported the gain from the sale of land and unharvested crops to Rancho and gain from the assignment of leaseholds of land upon which unharvested crops were growing to Black Land as capital gains. Petitioners elected to use the installment basis in reporting the gain realized from these transactions. The expenses incurred by petitioners in planting and growing the unharvested crops on the land conveyed to Rancho in 1955 and 1956 were allocated to the basis of the unharvested crops by petitioners in their Federal income tax returns for determining the gain from the disposition thereof. The expenses incurred by petitioners in planting and growing the unharvested crops on the land covered by the leases assigned to Black Land were deducted by petitioners as ordinary business expense on their Federal income tax returns for the taxable year 1955.

Respondent in his notice of deficiency to each petitioner, after reallocating the income and expenses of Rancho for its fiscal period August 30, 1955, to May 31, 1956, its fiscal year ended May 31, 1957, and the period June 1 to December 31, 1957, to the calendar years 1955, 1956, and 1957, and making similar reallocations of the income and expenses of Black Land, included the reallocated income and deducted such expenses of both Rancho and Black Land in determining the taxable income to be divided equally between petitioners. Respondent in these notices reduced each petitioner's income by the capital gain reported on the sales to Rancho and Black Land. Respondent gave the explanation that the income and expenses claimed by the corporations on their returns were in reality income and allowable deductions of petitioners and that petitioners' capital gains were overstated due to reporting sales which were not recognized. Reference was made to an exhibit attached to the notice of deficiency for further explanation. This exhibit contained the following explanation with respect to the income and expenses of both Rancho and Black Land:

The above income and expense is being allocated to the individual returns of the sole stockholders, as it appears that the primary purpose of organization is that of tax avoidance. (Substance versus Form) (Section 269 IRC., 1954.)

Respondent, by amendment to his answer, affirmatively alleged that an additional authority for his action in disregarding the transactions between petitioners and Rancho and Black Land is contained in the provisions of section 482 of the Internal Revenue Code of 1954, and in the alternative alleged that if the sales are recognized, the portion thereof attributable to unharvested crops is taxable to petitioners as

ordinary income under the provisions of section 1231(b)(4) of the Internal Revenue Code of 1954.

OPINION.

Respondent's primary contention is that the transfers by petitioners to Rancho and Black Land were sham transactions so lacking in substance that no effect should be given thereto for tax purposes. Respondent relies on *Lucas* v. *Earl*, 281 U.S. 111 (1930), *Gregory* v. *Helvering*, 293 U.S. 465 (1935), *Higgins* v. *Smith*, 308 U.S. 473 (1940), and *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945).

Respondent does not precisely argue that the corporate entity of the two corporations should be ignored but rather bases his argument on his contention that the sales here involved were not arm's-length transactions. However, in contending that the sales should be ignored so that the real property and the leases are considered for tax purposes to continue to be those of petitioners, respondent is in reality asking that we overlook the corporate entities. Certainly, a transaction between a sole stockholder and his corporation is not arm's length in the same sense that a transaction between unrelated persons with adverse interest is arm's length. While the fact that a transaction was, in this sense, not arm's length requires that it be carefully scrutinized, it does not of itself justify disregarding it for tax purposes. *Sun Properties* v. *United States*, 220 F. 2d 171 (C.A. 5, 1955). Here title to the property sold was transferred and the deeds recorded. The consideration recited was fair and represented the fair market value as determined by an independent appraiser. Mortgages were taken to secure the unpaid balance of the sales price and were recorded. The sales price was actually paid to petitioners. The sales agreements did not refer to the crop mortgages on the unharvested crops transferred which petitioner had given to Anderson, Clayton & Co. but petitioner notified the mortgagor of the sales and paid the mortgages. The sales agreement provided for petitioner's supplying water to the purchasers for a 5-year period. Petitioner continued to operate the farms but in so doing acted in the corporate names as their president. While apparently the Department of Agriculture permitted the farms to remain constituted for cotton allotment purposes as before the transfers, this was done at the request of the corporations after they gave notice of the transfers. The property transferred was treated by the corporations as their property in negotiating crop loans and obtaining soil bank payments from the Department of Agriculture and loans from the Commodity Credit Corporation. To refuse to recognize these sales for tax purposes would, in reality, be disregarding the separate corporate entities of Rancho and Black Land. Cf.

*Herbert C. Johnson*, 30 T.C. 675 (1958). In *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943), the Supreme Court stated at pages 438–439:

The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.

Petitioner has not shown the reason why he chose to organize the two corporations and transfer a portion of the farms he owned or leased thereto. It is not, however, the personal purpose of a taxpayer in creating a corporation which is determinative of whether its separate entity will be disregarded for Federal tax purposes, but rather whether a bona fide intention in creating it was that the corporation, itself, should have some substantial business function or actually engage in a business activity. *Jackson* v. *Commissioner*, 233 F. 2d 289 (C.A. 2, 1956), affirming 24 T.C. 1 (1955). The charters of both Rancho and Black Land stated that they were organized to engage in the business of farming. They held themselves out to departments of the Federal Government, to the State of Arizona, and to private persons as engaging in the farming business. The land transferred to them was farmed by labor paid by their checks. The supervision of the farming operation was done by petitioner, but corporate entity is not to be disregarded because an officer of that corporation, in his capacity of officer, conducts the corporate business. Cf. *Sebago Lumber Co.*, 26 T.C. 1070 (1956).

Both Rancho and Black Land maintained bank accounts, employed laborers, had some permanent employees, negotiated loans with respect to farming the properties, kept books and records, and held stockholders and directors meetings. The clear inference from the record as a whole is that these corporations have continued the farming activity for which they were organized from the date of their incorporation to the date of the trial, a period of over 6 years, and there was no indication that they were contemplating ceasing such operations. We recognize that if the business activity of the corporation is a sham and unreal, respondent may disregard its separate entity for tax purposes and that escaping taxation is not a business activity. See *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949), footnote 20. However, this does not mean that the separate entity of the corporation may be disregarded by the respondent merely because its sole stockholder retains detailed direction of its affairs. *Chelsea Products, Inc.*, 16 T.C. 840, 851 (1951) affd. 197 F. 2d 620 (C.A. 3, 1952). The facts in the instant case do not justify disregard-

ing the separate operation of Rancho and Black Land for Federal tax purposes.

Respondent contends that if the income attributable to the land leases and crops is not taxable to petitioners as the taxpayers that created and earned such income, it should be allocated to them under section 269 of the Internal Revenue Code of 1954. Section 269 of the Internal Revenue Code of 1954 provides in part:

> (a) IN GENERAL.—If—
>   (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or
>   (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transfer or corporation,
> and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * *

Respondent contends that petitioners have shown no purpose for organizing Rancho and Black Land other than the avoidance of Federal income tax and relying on *James Realty Company* v. *United States*, 280 F. 2d 394 (C.A. 8, 1960), argues that section 269 applies to acquiring control of a new corporation as well as an existing corporation. If we accept both respondent's contentions, we are unable to see how section 269 is applicable to the instant situation. Respondent has not disallowed to petitioners any deduction, credit, or other allowance but has rather increased both the income and deductions claimed by petitioners on their returns. Since respondent has not attempted to disallow to petitioners a deduction, credit, or other allowance claimed by them, section 269 of the Internal Revenue Code of 1954 is by its terms inapplicable.

Respondent contends in the alternative that if the sales were valid sales, the gain on the sales of unharvested crops is taxable to petitioners as ordinary income. Where a person engaged in the farming business sells the unharvested crops on his farmland, the gain on such sale, unless it comes within the provisions of section 1231(b)(4) of the Internal Revenue Code of 1954 [1] is taxable to such person as ordi-

---

[1] SEC. 1231(b)(4). UNHARVESTED CROP.—In the case of an unharvested crop on land used in the trade or business and held for more than 6 months, if the crop and the land are sold or exchanged (or compulsorily or involuntarily converted) at the same time and to the same person, the crop shall be considered as "property used in the trade or business."

nary income. *Watson* v. *Commissioner*, 345 U.S. 544 (1953). Respondent takes the position that petitioners sold unharvested crops and that the provisions of section 1231(b)(4) are inapplicable to the sale under his regulations which provide:

(f) *Unharvested crops.* Section 1231 does not apply to a sale, exchange, or involuntary conversion of an unharvested crop if the taxpayer retains any right or option to reacquire the land the crop is on, directly or indirectly (other than a right customarily incident to a mortgage or other security transaction). The length of time for which the crop, as distinguished from the land, is held is immaterial. A leasehold or estate for years is not "land" for the purpose of section 1231. [Sec. 1.1231-1(f), Income Tax Regs.]

Respondent contends that the gain on the sale of the unharvested crops does not come within the provisions of section 1231(b)(4) of the Internal Revenue Code of 1954 and his regulations since petitioners as owners of all the voting stock of Rancho had a right to reacquire the land sold to Rancho and that the unharvested crops sold to Black Land were on leased land. Petitioners argue that their stock ownership in Rancho did not give them the right to reacquire the land, that they merely assigned leaseholds to Black Land and did not sell unharvested crops to it, and that respondent's regulation is invalid. The provision of respondent's regulation that "A leasehold or estate for years is not land" for the purpose of this section [2] was held in *Bidart Bros.* v. *United States*, 262 F. 2d 607 (C.A. 9, 1959) to be a valid interpretation of the statute and among the reasons given as supporting this conclusion was the holding of the Supreme Court in *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955) that the capital asset provisions, which create an exception from normal tax requirements of the Internal Revenue Code, must be narrowly applied. Under the rationale of the *Corn Products Co.* case, we likewise consider respondent's regulation that a leasehold is not land for the purpose of section 1231 to be a valid interpretation of the statute.

While technically petitioners assigned leaseholds to Black Land, they, in effect, sold to Black Land the unharvested crops. In fact, the evidence shows that the major value of the leaseholds was the unharvested crops thereon. We, therefore, sustain respondent in his alternative position with respect to the sale of the unharvested crops to Black Land.

No case dealing with the provision of respondent's regulation that section 1231 of the Internal Revenue Code of 1954 does not apply to a sale of an unharvested crop if the taxpayer retains any right or

---

[2] The reference there was to sec. 117(j)(3), I.R.C. 1939, which contains substantially the same provisions as sec. 1231(b)(4), I.R.C. 1954.

option to reacquire the land the crop is on, directly or indirectly, has come to our attention. This regulation should be sustained "unless unreasonable and plainly inconsistent" with the statute. *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 501 (1948). It is issued under a section of the Code which extends to a gain realized from the sale of unharvested crops under specified conditions the treatment accorded to the gain on the sale of a capital asset which has been held for over 6 months. The "definition of a capital asset must be narrowly applied." *Corn Products Co.* v. *Commissioner, supra.* To hold that respondent's regulation is invalid would be, in effect, to say that Congress, in enacting section 1231(b)(4), intended to permit a farmer to have the gain from the sale of his unharvested crops subject to the favorable treatment accorded to gains from the sale of capital assets even while he retained a right to reacquire the land on which they were growing and continue to use it in his farming business. We do not think that this was the Congressional intent in the enactment of section 1231(b)(4) of the Internal Revenue Code of 1954, particularly in view of the fact that at the time of the enactment of this section of the Internal Revenue Code of 1954, section 39.117(j)-1(d), Regs. 118, issued under the similar provisions of section 117(j)(3) of the Internal Revenue Code of 1939 contained a provision to the same effect as that now contained in section 1.1231-1(f), Income Tax Regs. See *Helvering* v. *Reynolds Co.*, 306 U.S. 110, 115 (1939).

Since we believe respondent's regulations to be a valid interpretation of the statute, it is necessary to consider petitioners' argument that they did not retain any right or option to reacquire the land directly or indirectly. Neither the deeds to Rancho nor the agreements entered into between petitioners and Rancho contained any provision giving petitioners any right or option to reacquire the land. Therefore, any such right must rest on the indirect right to reacquire the land which respondent contends existed because petitioners were the sole holders of voting stock of Rancho. There are numerous cases involving the tax consequences of dealings between a sole stockholder and his corporation. In many instances the very reason that the controversy arises is the existence of the domination and control such a stockholder has over his corporation. See *Higgins* v. *Smith, supra.* The use of such dominion and control is demonstrated here by petitioner, as president of Rancho, after the 1955 transfer of land to Rancho, requesting the Department of Agriculture not to reconstitute the farm which included the transferred acreage. Although the record is far from clear as to the reason for this request, it appears that leaving the farm constituted as it was prior to the 1955 transfer to Rancho benefited petitioner in the use of the cotton allotment acreage

by enabling him to plant a larger portion of the 1956 crop on land he retained until that year and transferred to Rancho when the 1956 cotton crop was mature. Congress has recognized the mutuality of economic interest between a stockholder and his controlled corporation in the enactment of statutes providing special treatment of certain transactions.[3] However, it does not follow from the absence of a special statutory provision that some general provision or rule of law might not require special treatment of transactions between a sole stockholder and his corporation, *Higgins* v. *Smith, supra*. We hold that petitioners retained indirectly the right to reacquire the land sold to Rancho in 1955 and 1956 within the meaning of section 1.1231–1(f), Income Tax Regs., and the gains on the sale of the unharvested crops are taxable to them as ordinary income.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

[3] For example the sale by a stockholder of depreciable property to his controlled corporation is dealt with in sec. 1239, I.R.C. 1954, which provides:

(a) TREATMENT OF GAIN AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—

\* \* \* \* \* \* \*

(2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren ;

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

(b) SECTION APPLICABLE ONLY TO SALES OR EXCHANGES OF DEPRECIABLE PROPERTY.—This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167.

