ADOLPH WEINBERG AND ETTA WEINBERG, SUGAR DADDY, INC., ET AL.,[1] PETITIONERS, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 93361, 93353, 93354, 93362–93371.   Filed May 28, 1965.

*Ronald J. Del Guercio* and *Richard A. Del Guercio*, for the petitioners.

*Marion Malone*, for the respondent.

WITHEY, *Judge:* These proceedings involve income tax deficiencies and additions to tax under section 6651(a) of the Internal Revenue Code of 1954 as follows:

| Petitioner | Taxable year | Deficiency | Addition to tax, sec. 6651(a) |
|---|---|---|---|
| Weinberg, Adolph, et ux., docket No. 93361 | 1955 | $316,348.02 | |
| | 1956 | 105,149.08 | |
| Sugar Daddy, Inc., docket No. 93353 | 4/22–7/31/55 | 5,041.67 | |
| | Ended 7/31/56 | 3,880.61 | |
| | Ended 7/31/57 | None | |
| Vegetable Farming Co., docket No. 93354 | 3/4–3/31/55 | 944.61 | $413.42 |
| | Ended 3/31/56 | 3,569.95 | |
| A. W. Farms Co., docket No. 93362 | 3/9–6/30/55 | 3,539.63 | 626.55 |
| | Ended 6/30/56 | 4,503.23 | |
| | Ended 6/30/57 | None | |
| Best Lettuce Co., docket No. 93363 | 3/4–3/31/55 | 4,319.58 | 1,405.66 |
| | Ended 3/31/56 | 1,020.30 | |
| | Ended 3/31/57 | 696.39 | |
| Brookside Farms, Inc., docket No. 93364 | 4/22–6/30/55 | 45.93 | 432.41 |
| | Ended 6/30/56 | 1,523.87 | |
| | Ended 6/30/57 | 2,909.36 | |
| Chief Farms, Inc., docket No. 93365 | 4/22–8/31/55 | 2,529.81 | |
| | Ended 8/31/56 | 240.41 | |
| Girard Farming Co., docket No. 93366 | Ended 4/30/57 | 2,013.72 | |
| Imperial Lettuce Farms, Inc., docket No. 93367 | 3/4–3/31/55 | 4,518.82 | 1,577.10 |
| | Ended 3/31/56 | None | |
| | Ended 3/31/57 | 2,890.90 | |
| Lettuce Farming Co., docket No. 93368 | 3/4–3/31/55 | 4,678.46 | 3,296.78 |
| | Ended 3/31/57 | 4,114.00 | |
| Lion Farms, Inc., docket No. 93369 | 4/22–8/31/55 | None | |
| | Ended 8/31/56 | 4,324.91 | |
| Parsons Farms, Inc., docket No. 93370 | 4/22–6/30/55 | None | 432.41 |
| | Ended 6/30/56 | 2,693.39 | |
| Shannon Farms, Inc., docket No. 93371 | 5/11–6/30/55 | 2,127.75 | 414.25 |
| | Ended 6/30/56 | 4,362.09 | |

The deficiencies result from respondent's determination that the several corporate petitioners are not recognizable tax entities and that the income from the sale of the crops which the individual petitioners allegedly assigned to them is taxable to the individual petitioners.

FINDINGS OF FACT

Petitioners Adolph and Etta Weinberg are husband and wife, residing at Norwalk, Calif.   They filed joint returns for the calendar

---

[1] Proceedings of the following petitioners are consolidated herewith: Vegetable Farming Co., docket No. 93354; A. W. Farms Co., docket No. 93362; Best Lettuce Co., docket No. 93363; Brookside Farms, Inc., docket No. 93364; Chief Farms, Inc., docket No. 93365; Girard Farming Co., docket No. 93366; Imperial Lettuce Farms, Inc., docket No. 93367; Lettuce Farming Co., docket No. 93368; Lion Farms, Inc., docket No. 93369; Parsons Farms, Inc., docket No. 93370; and Shannon Farms, Inc., docket No. 93371.

years 1955 and 1956. The term "petitioner," as hereinafter used, will refer to Adolph Weinberg unless otherwise indicated. The other petitioners are California corporations with their principal offices located at the same business address as petitioner, 12948 South Pioneer Boulevard, Norwalk, Calif. All of the petitioners filed their returns with the director of internal revenue at Los Angeles. Their returns were made, and their books and records kept, on a cash receipts and disbursements method of accounting. The returns filed by petitioner and his wife were made on a calendar year basis and those for the corporate taxpayers were for fiscal years corresponding to their various accounting periods.

During the taxable years and at all times here material petitioner was engaged in farming in the Imperial Valley, county of Imperial, Calif. Most of his farming operations during 1955 and 1956 were conducted through a partnership composed of himself and his wife and known as the Adolph and Etta Weinberg partnership. This partnership will be referred to hereinafter as the Weinberg partnership.

Imperial Valley is a highly productive farming and citrus-growing area located about 200 miles south of Norwalk, Calif., and extending approximately 70 miles north and south and 30 miles east and west.

Petitioner has been engaged in farming and related business in that area for a number of years. He is president of Coast Grain Co., a corporation engaged in the dairy and cattlefeed business at Norwalk, and devotes most of his time to that business. Coast Grain Co. made loans in large amounts to its customers for financing their farm and livestock operations.

In his farming operations petitioner purchases or leases a tract of land and engages a farmer, either an individual, corporation, or partnership, to grow the crops, usually on a share-crop or profit-sharing basis.

In 1952 petitioner entered into a farming venture with another partnership, Holtville Vegetable Co. This partnership, hereinafter referred to as the Holtville partnership, was composed of three partners, unrelated to petitioner. Under the terms of the Holtville venture, petitioner was to finance certain farm operations and the partnership was to manage the farms and do all of the farmwork. The profits were to be divided 47½ percent to petitioner and 52½ percent to the partnership. About 1,100 acres of farmlands, known as the Coppinger properties, consisting of a number of different tracts of land, were involved. The land was then under lease to the Holtville partnership, which subleased it to petitioner. The Holtville venture agreement expired at the end of the 1955 crop year.

In 1952 petitioner leased other farmlands which he placed under the management of another grower, James Bedwell, on a salary basis.

The principal crops grown on the farms in which petitioner had an interest were cotton, sugar beets, alfalfa, flax, barley, lettuce, and carrots. For cotton, the land is prepared and seeded in January and February and the crops harvested in the same months of the following year. For the other crops, except alfalfa, the seeding is done in July, August, and September and the harvesting in the spring and early summer of the following year. Alfalfa is usually a 3-year crop with several annual cuttings over the period from January to September.

Farming in Imperial Valley, as elsewhere, generally is a hazardous occupation depending on weather conditions, the adaptability of the soil to different types of crops planted thereon, the extent of insect infestation, and other factors. In the first 2 years of its existence, 1952 and 1953, the Holtville farming venture sustained operating losses, petitioner's share of which amounted to approximately $100,000.

In February 1955, petitioner had a conference with his accountants and attorney for the purpose of reviewing and reorganizing his business affairs. His health was not of the best and, on his doctor's advice, he was contemplating a trip of several months to Europe. It was decided at the conference that petitioner would turn over some of his farming business to a number of corporations to be organized for that purpose. Petitioner instructed his attorney to form the proposed corporations and stated that he would go to Imperial Valley and analyze the remaining unharvested fields and would transfer certain growing crops and $1,000 in cash to each of the corporations in exchange for all of its capital stock. Accordingly, articles of incorporation for the proposed corporations were prepared by the attorney and were filed with the secretary of state of California. Thereafter, applications for the issuance of stock were filed by the corporations with the commissioner of corporations of the State of California, and all of their stock was issued to petitioner either in the latter part of 1955 or early in 1956 as shown below. The following table shows the dates on which the articles of incorporation for each corporation were filed and the dates on which the stock was issued:

| Corporation | Articles of incorporation filed | Stock issued |
|---|---|---|
| | *1955* | *1955* |
| Best Lettuce Co | Mar. 4 | Oct. 30. |
| Vegetable Farming Co | ____do | Oct. 24. |
| Imperial Lettuce Farms, Inc | ____do | Nov. 15. |
| Lettuce Farming Co | ____do | Do. |
| A. W. Farms Co | Mar. 9 | Do. |
| E T Farming Co | ____do | Dec. 22. |
| Chief Farms, Inc | Apr. 22 | Oct. 30. |
| Parsons Farms, Inc | ____do | Nov. 16. |
| Brookside Farms, Inc | ____do | Oct. 15. |
| Gold Farms, Inc | ____do | Do. |
| Sugar Daddy, Inc | ____do | Oct. 24. |
| Lion Farms, Inc | ____do | Oct. 14. |
| Shannon Farms, Inc | May 11 | Do. |
| Girard Farming Co | May 19 | (Not shown.) |

(Each of the above-named corporations will be identified hereinafter by the first word of its name, as Best, Vegetable, Imperial, etc.)

Petitioner was named president, his son Maxwell Weinberg vice president, and another son Dale Weinberg secretary and treasurer, and all of these officers were named directors, of each of the corporations. The articles of incorporation of all of the corporations are alike and provide, generally, for the conduct of farming operations.

In the latter part of February 1955, petitioner made a survey of the Imperial Valley farms and informed the Holtville partnership and Bedwell that he was going to transfer his interest in certain of the growing crops on the farms to the several corporations and that these crops were to be harvested and sold for the corporations and not for his personal account. He designated field by field the crops which were to be transferred to each corporation.

Thereafter, the crops designated for transfer to the several corporations were harvested and sold and the proceeds of the sales were deposited in bank accounts in the name of the corporations. The sugar beets were all delivered and sold to Holly Sugar Corp., hereinafter referred to as Holly, and, in payment therefor, Holly, under previous instructions from petitioner, drew drafts payable to the corporation which petitioner had designated to receive them. For instance, over the period June 15, 1955, to May 31, 1956, Holly issued drafts payable to Shannon for sugar beets purchased on the dates and in the amounts as follows:

| Draft No. | Date | Amount |
|---|---|---|
| 9068 | June 15, 1955 | $12,435.03 |
| 7198 | June 30, 1955 | 11,705.47 |
| 7217 | July 7, 1955 | 4,825.82 |
| 7688 | Dec. 1, 1955 | 273.92 |
| 7689 | ----do---- | 1,407.25 |
| 8069 | Jan. 25, 1956 | 2,809.43 |
| 8068 | ----do---- | 546.11 |
| 1786 | May 31, 1956 | 278.55 |
| 1787 | ----do---- | 1,435.03 |
| Total | | 35,716.61 |

After the beet harvest was completed, petitioner's attorney prepared bills of sale by which petitioner purported to transfer to each corporation the exact tonnage of beets delivered and sold to Holly for its account. The bills of sale were predated to the date of the first directors meeting held by the corporation designated to receive the proceeds. The same general plan was followed with the lettuce and other produce harvested and sold to other buyers. All parties concerned treated the produce, or proceeds from its sale, as property of the several corporations which petitioner had designated to receive them. All of the crops were actually harvested after the dates appearing on the bills of sale.

The produce which was to be shipped by rail was loaded on cars as it was harvested and when each car was sold, a jacket was placed

on it designating the corporation for whose account it was harvested and sold as the seller and showing the contents of the car, the purchaser, and the selling price.

Certain expenses relating to shipping the produce, such as brokerage and car refrigeration, were paid by the corporations. These expenses were recorded in the separate accounts of the corporations and claimed as deductions in their income tax returns. The other general expenses of harvesting were paid either by the Holtville partnership or petitioner. None of the corporations engaged in any farming activities of their own until after the close of their 1955 fiscal years.

There were 12 of the bills of sale bearing 1955 dates, all of which described certain quantities of harvested crops. Thereafter, petitioner executed six additional bills of sale, each dated March 15, 1956, purporting to assign to one of the corporations "all of the Sugar Beets currently growing on the following described property" and containing a description of the farmlands on which the beets were growing. Typical of each group of bills of sale are the following, which were issued to Chief and Sugar:

BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that I, ADOLPH WEINBERG, as a capital contribution to CHIEF FARMS, INC., a California corporation, do hereby transfer to CHIEF FARMS, INC., the following described agricultural crops.
    Sugar Beets—1,496.6045 Tons

And I hereby covenant that I am the lawful owner of said goods; that they are free from all encumbrances; that I have the right to sell the same as aforesaid; and that I will warrant and defend the same against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, I have hereunto set my hand this 4th day of May, 1955.

(S)  Adolph Weinberg.
ADOLPH WEINBERG.

BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that I, ADOLPH WEINBERG, as a capital contribution to SUGAR DADDY, INC., a California corporation, do hereby transfer to SUGAR DADDY, INC., all of the Sugar Beets currently growing on the following described property:
    One half of the 174.1 Acres, S½ of Section 22, T. 12, R. 15, EXCEPT the West
    80 Acres, Nutmeg Canal, Gates 6 & 7.

And I hereby covenant that I am the lawful owner of said goods; that they are free from all encumbrances; that I have the right to sell the same as aforesaid; and that I will warrant and defend the same against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of March, 1956.

(S)  Adolph Weinberg.
ADOLPH WEINBERG.

Following is a description of the produce purportedly assigned to

each of the corporations by the bills of sale referred to above and the dates appearing thereon:

| Corporation | Crop | Date |
|---|---|---|
| Vegetable Farming Co | Lettuce<br>9,798 crates (2 doz. size)<br>2,635 crates (2½ doz. size)<br>400 crates (4 doz. size)<br>1,227 cartons (40 lbs. ea.)<br>3,417 wooden crates (72 lbs. ea.) | Mar. 11, 1955 |
| Lettuce Farming Co | Lettuce<br>15,827 crates (2 doz. size)<br>650 crates (4 doz. size)<br>1,227 cartons (40 lbs. ea.)<br>3,417 wooden crates (72 lbs. ea.) | Do. |
| Imperial Lettuce Farms, Inc | Lettuce<br>12,950 crates (2 doz. size)<br>1,279 crates (2½ doz. size)<br>201 crates (4 doz. size) | Mar. 14, 1955 |
| Best Lettuce Co | Lettuce<br>18,479 crates (2 doz. size)<br>642 crates (2½ doz. size)<br>1,227 cartons (40 lbs. ea.)<br>3,417 wooden crates (72 lbs. ea.) | Mar. 29, 1955 |
| A. W. Farms Co | Barley—564.2375 tons<br>Carrots—15,220 50 lb. bags<br>312 75 lb. bags<br>117 65 lb. bags | Do. |
| Parsons Farms, Inc | Sugar beets—3443.3865 tons | Apr. 22, 1955 |
| Brookside Farms, Inc | Sugar beets—3443.3865 tons | Do. |
| Lion Farms, Inc | Sugar beets—2,536.9870 tons | Apr. 29, 1955 |
| Sugar Daddy, Inc | Flax—155.17 tons<br>Barley—371.235 tons | May 4, 1955 |
| Chief Farms, Inc | Sugar beets—1,496.6045 tons | Do. |
| Gold Farms, Inc | Sugar beets—2,535.5205 tons | May 9, 1955 |
| Shannon Farms, Inc | Sugar beets—2894 tons | May 18, 1955 |
| Sugar Daddy, Inc | Sugar beets (on described property) | Mar. 15, 1956 |
| Imperial Lettuce Farms, Inc | ____do | Do. |
| Lettuce Farming Co | ____do | Do. |
| Girard Farming Co | ____do | Do. |
| Lion Farms, Inc | ____do | Do. |
| Best Lettuce Co | ____do | Do. |

The books and records of the Holtville partnership were kept by one of the three partners, E. N. D. Hatch, who handled the partnership's sales of produce. Hatch first learned that petitioner was organizing the corporations in a telephone conversation with petitioner's accountant in late February 1955. He was told that petitioner's interest in the crops from certain farmlands had been assigned to the several corporations and that he would be furnished a list of the crops belonging to each corporation. Petitioner gave similar notice to Holly. The harvesting of the first of these crops, the sugar beets, was begun early in March 1955. As sales of the produce were made, the proceeds were deposited by Holly in separate accounts in local banks to the credit of the corporations designated to receive them. The bank accounts for the corporations were opened by Hatch for that purpose. Deposit slips were made out for each deposit and a copy was sent to petitioner's accountant.

The corporations all adopted, for accounting purposes, fiscal years as follows: Lion, Gold, and Chief adopted the fiscal year ending August 31; E T, the fiscal year ending February 28; Lettuce, Vegetable, Best, and Imperial, the fiscal year ending March 31; Girard, the

fiscal year ending April 30; Shannon, Brookside, Parsons, and A. W., the fiscal year ending June 30; and Sugar, the fiscal year ending July 31. Their returns were filed on the basis of such fiscal years.

The crops grown by the Holtville partnership, those in which petitioner had an interest, included about 600 acres of lettuce, 200 acres of carrots, 135 acres of beets, 80 acres of flax, and 30 or 40 acres of cabbage.

Loans amounting to $280,900 were made by the several corporations in 1955 to Coast Grain Co. on its 6 months' promissory notes bearing 6-percent interest. The moneys were used by Coast Grain Co. for loans to its customers.

All of the petitioner corporations have continued in existence up to the present time. They have all regularly kept separate books and accounts and have filed income tax returns showing their receipts from the sale of farm produce and expenses incurred in their operations. Some of them, from time to time, have entered into lease agreements and partnership agreements with third parties pertaining to farming operations. Petitioner has continued as their president and sole stockholder and has conducted most of their affairs. As president of the corporations, he performed about the same services on their behalf as he had previously performed on his own behalf, such as acquiring leases, contracting with farmers, and financing farm operations. The corporations did not do the actual farming.

The assigned crops were given a cost basis of zero both by petitioner and the corporations. The books and records and returns of neither petitioner nor the corporations show any gain or loss on petitioner's assignment of produce to the corporations or his receipt of the corporations' stock.

In its partnership returns for the calendar years 1955 and 1956, the Weinberg partnership reported total income in the respective amounts of $436,586.30 and $429,634.92. These amounts included rentals from "Imperial Valley Ranches" of $159,829.50 in 1955 and $169,283.48 in 1956 and interest in the respective amounts of $102,889.07 and $81,406.91. Neither the partnership nor petitioner individually reported any income from the sale of farm produce by or on behalf of any of the corporations. The several corporations reported total income of $239,994 in 1955 and $177,086.12 in 1956.

In March 1955, E T formed a partnership with Stafford–Hannon to raise cotton on approximately 700 acres of Imperial Valley farmland. Hannon agreed to lease the land to the partnership for one-quarter of the cotton produced, with a guaranteed rental of $60 per acre, and was to receive a salary of $6,400 per year. The partnership profits and losses were to be shared equally by Hannon and E T. The partnership reported net profits of $4,841.12 in the calendar year 1955 and $10,767.95 in 1956.

Respondent determined in his notice of deficiencies to Adolph and Etta Weinberg that the 14 above-named corporations are not recognizable tax entities and that the income reported by them in 1955 and 1956 is all taxable to them (Adolph and Etta Weinberg). He further determined in deficiency notices to the several corporations that they were entitled, collectively, to only one surtax exemption. The deficiencies determined against them result entirely from this adjustment. He made no changes in the income and expenses reported by the corporations in their returns.

Income tax returns for the several corporations for their respective fiscal years ending in 1955 were all filed on the same date, October 17, 1955. For some of the corporations the returns were timely and for others, including A. W., Best, Brookside, Imperial, Lettuce, Parsons, Shannon, and Vegetable, they were delinquent. The reasons given for the belated filings were that petitioner was in Europe at the time for filing and his accountant who had been instructed to file the returns negligently failed to do so.

The stipulated facts are included herein by this reference.

OPINION

In his notice of deficiences to Adolph and Etta Weinberg, docket No. 93361, respondent determined that the 14 above-named corporations were not recognizable tax entities and that the income attributed to them was all income of the Weinberg partnership. He further alleged "in the alternative" that if such corporations are entitled to recognition, then, clearly to reflect income, either the proceeds from the sale of the crops should be imputed to the partnership which performed all of the services and bore all the expenses of producing the crops or the costs of production should be allowed as deductions to the corporations and not the partnership.

Petitioners alleged in their petition that—

(d) The Commissioner erred in determining that the income reported by each of the corporations was properly reportable by the Adolph and Etta Weinberg Partnership or by the petitioners.

(e) The Commissioner erred in determining that the Adolph and Etta Weinberg Partnership created or earned or controlled the income of each of the corporations.

These allegations are denied, generally, in respondent's answer. Counsel for respondent in his opening statement at the trial stated:

Respondent expects the evidence in this case to show that neither harvested nor unharvested crops were transferred to these corporations but rather the proceeds from the sale of these crops were given to the corporations as capital.

These proceeds were income to the individual petitioners which they attempted to assign to the corporations before including it in their own income.

In his briefs respondent's chief argument is that the proceeds from the sale of the crops should be included in the income of the Weinberg

partnership for the reason that the harvested crops were in fact sold by the partnership and the income realized by the partnership. This contention, we think, is not a departure from respondent's determination or the pleadings, but merely offers a different reason than that advanced in the notice of deficiency for the inclusion of the proceeds from the crop sales in the partnership income.

On the evidence of record we think the factual conclusion is inevitable that what was assigned to the several corporations in exchange for their stock was not crops, either growing or harvested, but the proceeds from the sale of the crops. The only tangible evidence of any actual transfers to the corporations are the bills of sale made out by the petitioners to the corporations allegedly in part consideration for their stock. The purported assignments in the twelve 1955 bills of sale were of certain specified crops, such as so many tons of beets or so many crates of lettuce. Taken at face value these bills of sale would indicate that what was assigned to the corporations was harvested, and not growing, crops as petitioners contend. However, at the time when the bills of sale were executed, the crops had all been harvested and sold and the proceeds deposited in bank accounts of the several corporations.

At the trial respondent presented evidence tending to show that none of the bills of sale were in fact prepared until sometime during 1958 or early in 1959, and about a year after the examining revenue agent had requested them. The dates appearing on the bills of sale and the actual dates of their execution are, we think, of no great importance here. It is not disputed that these bills of sale were all executed after the crops had been harvested and sold and were predated to coincide with the first meetings of the corporations' boards of directors. Likewise, the minutes of the corporations relating to the issuance of their stock show that they too were predated. For instance, the minutes of the first meeting of the directors of Sugar Daddy, Inc.,[2] dated May 4, 1955, denoted an acceptance from petitioners, in payment of its capital stock, of the same quantity of barley and flax described in the predated bill of sale bearing the same date. Until the harvesting was completed, there was no way in which the exact quantities of the crops specified in the bills of sale and the minutes could be ascertained.

The "growing crops" referred to in the bills of sale bearing 1956 dates were harvested and sold in the same manner. These bills of sale purported to represent additional contributions of capital to the corporations.

On the evidence before us we determine that petitioners transferred to the corporations neither growing nor matured crops but the pro-

---

[2] It was stipulated that the minute book of Sugar Daddy, Inc., should be received in evidence as typical of those of the other corporations.

ceeds from the sale of crops. These transfers occurred independently of the bills of sale when, under petitioners' direction, the proceeds from the sales were deposited in the corporations' bank accounts. We further determine that the crops were the property of the partnership at the time they were sold and that the proceeds from the sales were the income of the partnership.

In their briefs petitioners state:

> The purported inclusion by the respondent of the proceeds from the sales of the farm crops transferred to the corporations in 1955 in the income of Adolph is an attempt by the respondent to disregard the provisions of Section 351 of the Code, which prohibits the recognition of any gain or loss to Adolph on the transfer of the farm crops to the corporations in exchange for their stock. This, the Commissioner has no power to do. *Hanover Bank* v. *Comm'r.*, 369 U.S. 672, 687–688 (1962), 62–1 U.S.T.C. Para. 9487; *Lewyt Corp.* v. *Comm'r.*, 349 U.S. 237 (1955) 75 S. Ct. 736, 55–1 U.S.T.C. Para. 9460; *South Lake Farms, Inc.*, *supra.* * * *

What respondent has included in petitioners' income is not the gain from the transfer of the crops to the several corporations in exchange for their stock but rather the entire purchase price paid on the sale to third parties of the crops themselves.

In *South Lake Farms, Inc.*, 36 T.C. 1027, affd. 324 F. 2d 837, we held that a transfer of land and leaseholds and the growing crops thereon by one corporation to another in complete liquidation of the transferor corporation did not result in any gain to the transferor. The decision turned on the fact that there was a transfer of the land and leaseholds, as well as the growing crops, before any of the crops had been harvested and sold. It was based largely on our decision in *Elsie SoRelle*, 22 T.C. 459. There, a father had made gifts to his children of several parcels of land, together with the crops growing thereon. We held that the income from the sale of the crops was taxable to the children and not the father. In that case we relied largely upon *Pearce* v. *Commissioner*, 315 U.S. 543, where a wife, and not the husband, was held taxable on the income from an annuity contract which the husband had purchased for her in a predivorce agreement. The Court distinguished the *Horst, Eubank,* and *Harrison* v. *Schaffner* [3] cases on the grounds that the husband had parted with not only the right to receive the income but the corpus which produced it.

In the instant case, petitioner did not purport to transfer to the corporations any land or leaseholds, but only the crops growing thereon. At stated above, the only tangible evidence of any transfers to the corporations are the bills of sale. Those dated in 1955 specified certain crops and produce which had already been harvested and sold. Actually, since the crops had already been sold, the only thing relating

---

[3] *Helvering* v. *Horst*, 311 U.S. 112; *Helvering* v. *Eubank*, 311 U.S. 122; *Harrison* v. *Schaffner*, 312 U.S. 579.

to the crops petitioners could have owned, or assigned to the corporations at that time, was the proceeds from the sales of the crops.

It is argued by petitioners that the agreements between petitioners and the corporations regarding the assignment of growing crops should be construed according to the intention of the parties which, they argue, was that ownership of the growing crops should vest in the corporations at or about the time petitioners informed the farmers and buyers that the crops from certain designated fields would belong to the corporations. Any such agreement would have had to be between petitioner, representing the Weinberg partnership, and the directors of the several corporations. There is no proof of such an agreement. At most, there was only petitioner's expressed intention to sometime in the future assign the growing crops to the corporations.

The situation with respect to the 1956 bills of sale is somewhat different in that these bills of sale did specify the "growing crops" on certain farms. However, the evidence is that these crops were handled in the same manner as those referred to in the 1955 bills of sale and, we think, with the same tax consequences.

Aside from the normally difficult factual and legal questions presented, we are here confronted with a confused situation in the evidence. The parties have stipulated that the stock of each of the corporations was issued to petitioners "in exchange for $1,000 cash and farm crops." This stipulation is not inconsistent with respondent's first alternative determination that—

inasmuch as the partnership performed the services and incurred all of the expenses attributable to the matured crops which were transferred to the fourteen corporations, the sales proceeds should be imputed to the partnership in order clearly to reflect income.

However, the evidence of record, we think, clearly shows, and we have determined, that the proceeds from the sale of the crops, rather than growing or matured crops themselves, were transferred to the corporations by petitioners in exchange for their stock. Respondent makes this argument, for the first time, in his final brief and further argues that the stipulation to the contrary should be disregarded. He points out that the stipulation was filed at the opening of the trial before introduction of the evidence showing the predating of the bills of sale and corporate minutes and that it is not inconsistent with any position then taken by respondent in his determination of the deficiencies.

In our study of the evidence as a whole we are convinced that the stipulation is erroneous and that, as we have found, it was cash proceeds from the sale of the crops that were transferred to the corporations in exchange for their shares of stock.

The wording of the stipulation (as to the stock issued by Chief Farms, Inc.) is that—

A permit authorizing the issuance of stock was duly issued by the California Commissioner of Corporations on October 24, 1955, pursuant to the application of CHIEF therefor and the stock was duly issued to ADOLPH on October 30, 1955, in exchange for said $1,000.00 cash and farm crops.

The stipulation as to the other corporations is in the same language. We take the stipulation to mean no more than that the stock of the corporations was issued *nominally* for $1,000 cash and farm crops. At the time the stipulation was prepared, there was no contention between the parties as to whether farm crops or the equivalent in cash was paid in for the stock. Respondent was then relying on his determination that the corporations, in any event, were not entitled to recognition as tax entities. The stipulation could not have been intended to foreclose inquiry as to whether crops or the cash equivalent was paid in for stock. That question had never been raised.

Even if construed literally the stipulation would have to be rejected as being contrary to the preponderance of the other evidence. *William Ernest Seatree*, 25 B.T.A. 396, affd. 72 F. 2d 67. We said in that case:

It is stipulated that the assignment was executed and delivered to the Equitable Trust Company on June 29, 1922. We refuse to be bound by that stipulation, for it appears to be contrary to fact as disclosed by the record. * * *

And see *Gunderson Bros. Engineering Corp.*, 42 T.C. 419, 436.

For other reasons, too, we think respondent's determination that the income from the sale of the crops allegedly assigned to the corporations must be included in the income of the Weinberg partnership should be sustained. In *United States* v. *Lynch*, 192 F. 2d 718, the income from the sale of apples which a storage and warehouse corporation had purportedly distributed in kind to its stockholders but actually retained in its possession and sold in the course of its regular business was held taxable to the corporation. The court said:

We understand appellant to contend that the income in question is not that of the corporation. The answer is, that the corporation has performed the services which create the right to the income which brings into play the basic rule that income shall be taxed to him who earns it. Helvering v. Eubank, 1940, 311 U.S. 122, 61 S. Ct. 149, 85 L. Ed. 81. A corporate liquidation and transfer of assets cannot divert taxability of income already earned any more than does an assignment of such income. Cf. Helvering v. Horst, 1940, 311 U.S. 112, 61 S. Ct. 144, 85 L. Ed. 75; Helvering v. Eubank, supra.

To the same effect is *A.B.C.D. Lands, Inc.*, 41 T.C. 840, where the corporate taxpayer distributed to its stockholders in kind the warehouse receipts from grain which its tenant farmers had produced and delivered to a storage terminal. We held that this was an attempted anticipatory assignment of income which was taxable to the corporation.

The same basic principle applies here. Practically all of the services contributing to the production of the income were performed by petitioner or those representing the partnership. In a very true sense the income was all earned by the petitioners.

The impact of the *Lynch* and *A.B.C.D. Lands, Inc.* cases and the authorities there relied upon is not lessened by the fact that the purported assignments of the crops here were made by the stockholder to his corporations rather than by a corporation to its stockholders. Nor does the applicability of the rule require a determination as to whether there were effective assignments of growing or harvested crops. If the assignments were of income already earned whether or not their purpose was tax avoidance, they do not shift the burden of tax on such income.

There is no doubt in our minds, however, that tax avoidance was at least one of the purposes of the attempted assignment of the growing crops to the corporations. If the corporations had been organized primarily for the other purposes claimed by petitioner,[4] no plausible reason has been shown why the growing crops should have been assigned to them. Up to the time the crops were harvested and sold the corporations were mere shells without any assets or business activities. When the corporations did come into funds after and from the sale of the crops, they loaned the money to another of petitioner's corporations, Coast Grain Co.

With this disposition of the principal issue it becomes unnecessary to decide the other issues raised in the pleadings. The elimination from the corporations' income of the proceeds from the sale of the crops allegedly assigned to them leaves them without any income or tax liability in the years before us. We note that counsel for respondent was unable or unwilling to say at the time of the hearing what position the Commissioner of Internal Revenue is taking with respect to the recognition of the corporations as separate tax entities in years subsequent to 1955.

*Decisions will be entered under Rule 50.*

---

[4] Petitioner has undertaken to show that his chief purposes in organizing the corporations were to be able to divide his farming business among his children and grandchildren and to avoid individual risks in his farming operations. The facts are, however, that he has not yet made any transfers of the stock of any of the corporations and it has not been shown to what extent, if any, his personal risks on his farming business were lessened.