ESTATE OF HULDA MARTIN SPRENGER, DECEASED, ALBERT H. SPRENGER, JR., EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Sprenger v. Commissioner
Docket No. 11469-77.
United States Tax Court
T.C. Memo 1979-196; 1979 Tax Ct. Memo LEXIS 334; 38 T.C.M. (CCH) 819; T.C.M. (RIA) 79196; May 17, 1979, Filed Teairl W. Lewis, for the petitioner. William T. Overton, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $42,479.23 in petitioner's Federal estate tax. The only issue for decision is the value on June 7, 1974, the date of decedent's death, of decedent's 585-acre ranch located in Medina County, Texas. FINDINGS OF FACT Decedent Hulda Martin Sprenger, a resident of Texas, died on June 7, 1974. Albert H. Sprenger, Jr. (hereinafter Albert), and Clifton Albert Sprenger (Clifton), joint independent executors of decedent's estate, filed the Federal estate tax return with the Director, Internal Revenue Service Center, Austin, *335 Texas. When they filed the petition, Albert and Clifton were legal residents of San Antonio, Texas, and Corpus Christi, Texas, respectively. Decedent died owning a fee simple interest in 585 acres of land, commonly referred to as the Sprenger Ranch (the ranch), situated in the north central portion of Medina County, Texas, approximately 6.5 miles north of Hondo, Texas. A county-maintained gravel road crossed the ranch for a distance of approximately one mile, running generally parallel to the ranch's west boundary fence. A small area of the ranch abutting the county road was cultivated at one time. In 1974, that area was covered with native grasses. In addition, a larger area of the ranch was covered with sufficient vegetation to provide a pasture for limited cattle grazing. In general, however, the ranch, because of large outcroppings of rock, shallow soil covering (or overburden), and poor vegetation, was not suitable for cultivation or for cattle grazing. The "highest and best use" for the ranch was for hunting and recreation, and it had been leased for hunting for several years. Improvements located on the property consisted of an old frame storage building, a hay *336 shed, a windmill with concrete storage tank, a well with a pump and pressure tank, and boundary fencing. In 1974, all of the improvements were in poor condition. R.N. White, Jr. (White), who appraised the ranch on behalf of petitioner, and Warren B. Anderson (Anderson), who appraised the property for respondent, are both qualified experts in the field of real estate appraisal. Both experts appraised the property by the use of the comparable sales method. In the Federal estate tax return filed by decedent's estate, the ranch, listed at 585 acres exclusive of the valued at $76,050. In his statutory notice of deficiency, respondent determined that the ranch, including the acreage lying within the county road, had a value of $220,000. ULTIMATE FINDING OF FACT As of June 7, 1974, the date of decedent's death, the ranch had a value of $175,500, or $300 per acre for 585 acres. OPINION Section 2031(a), Internal Revenue Code of 1954, in the form in which it was in effect on the date of decedent's death, provided as follows: The value of the gross estate of the decedent shall be determined by including * * * the value at the time of his death of all property, *337 real or personal, tangible or intangible, wherever situated. For purposes of section 2031(a) of the Code, the term "value" means "fair market value," i.e., "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs. At the trial of the instant case, each of the parties presented an expert witness who had independently appraised the ranch's value as of June 7, 1974, the date of decedent's death. Both appraisers used the comparable sales method. White, petitioner's appraiser, valued the ranch at $200 per acre or $117,000, based on a total of 585 acres. Anderson, respondent's appraiser, set the value at approximately $375 an acre or $220,000, based on a total of 587 acres. We find the value of the ranch as of June 7, 1974, was $175,500, or $300 per acre based on a total of 585 acres. Petitioner and respondent disagree as to the total acreage of the ranch. Petitioner contends that approximately 2 acres out of an original 587 acres were deeded to Medina County so that the road, which crosses the *338 extreme western part of the ranch, could be built. Although the parties stipulated that the decedent owned 587 acres, we interpret this provision of the stipulation to include the 2 acres that had been deeded to the county. Cf. Weinberg v. Commissioner,44 T.C. 233, 244 (1965), affd. in part and revd. and remd. in part 386 F.2d 836 (9th Cir. 1967), cert. denied 392 U.S. 929 (1968); Garden City Feeder Co. v. Commissioner,27 B.T.A. 1132, 1144 (1933), revd. on another issue 75 F.2d 804 (8th Cir. 1935). We agree, therefore, with petitioner that the value of the ranch should be determined on the basis of 585 acres. Both experts testified that the "highest and best use" of the ranch was for hunting and recreation, and we accept their opinion on this point. The ranch had, in fact, been leased for hunting for several years. [1]/ The "comparble sales method" used by both White and Anderson involves an attempt to locate sales of equally desirable property with a similar "highest and best use." Any characteristic of the ranch or the comparable property which would make one more or less valuable than the other *339 necessitates an adjustment to arrive at the ranch's value. White and Anderson compared the ranch to the following property sales: White's Comparables Property
Date of Sale
Acreage
Per Acre Price
W-1
5/ 5/71
250.65
$262.00
W-2
10/ 9/72
236.4
232.00
W-3
8/11/76
1,094.423
275.00
W-4
6/ 1/72
604.8
224.79
Anderson's Comparables Property
Date of Sale
Acreage
Per Acre Price
A-1
9/ 6/73
240.27
$360.00
A-2
4/29/74
184.32
360.00
A-3
4/18/73
595.46
408.00
A-4
12/23/74
462
346.00
1. White's Appraisal
Although White found the properties, W-1 through W-4, to be comparable to the ranch, he discounted their sale prices for certain physical characteristics of those properties, including improvements, less severe rock outcroppings, thicker soil overburden, and superior vegetation, which he thought made those properties more valuable. In addition, White considered property W-3 as the most nearly comparable and property W-4 to be *340 the least comparable. White regarded W-3 as the most comparable because approximately 700 acres of that property was undeveloped land similar to the ranch. However, White considered that land superior to the ranch's land because the rock outcroppings were less prevalent, the soil overburden was thicker, and the vegetation was superior. The remaining approximately 400 acres were cleared land with substantial improvements. Those factors made that acreage more valuable than the ranch. In discounting the W-3 sales price by $75 an acre, White took into account, in addition to the above factors, the fact that the W-3 sale occurred in 1976, approximately 2 years after decedent's date of death. It was his opinion that the real estate market was in the doldrums in 1974 but was improving in 1976. White expressed the view that the sale prices of W-1 and W-2, the next most comparable sales, should be discounted for the same reasons, except the time factor. He considered W-1 and W-2 to be superior to the ranch because their soil overburden was thicker with little or no rock outcroppings. White gave very little weight to the W-4 property sale because the land was located in a part of *341 Medina County which differed a great deal from the ranch in topography and overburden. The main reason White used this property in his comparison was that it was located near Anderson's A-4 property. 2. Anderson's Appraisal
In analyzing the properties he used for comparison purposes, Anderson considered many factors, including the size of the property sold, whether the sale occurred near the valuation date, and whether the usage, topography, and soil were similar. With regard to A-1 and A-2, both of which sold for $360 an acre, Anderson considered the soil, the highest and best use, the vegetation, the topography, and the road access to be comparable to the ranch. He made this assessment even though there was a high hill located on A-1. It was his opinion, however, that the ranch's improvements were superior. Therefore, he adjusted the sale prices of both A-1 and A-2 upward by $10 per acre. Anderson considered A-3 to be more scenic than the ranch, but containing inferior soil. Nevertheless, the only adjustment which Anderson made to A-3's sale price was to discount it by $24 per acre to take into account A-3's more valuable improvements. As in the case of White's *342 W-4 property, Anderson gave the least weight to his fourth property. He used A-4 mainly because the sale occurred at approximately the same time as decedent's death. It was Anderson's opinion that A-4's and the ranch's highest and best uses were different because A-4's soil was suitable for cultivation. However, the only adjustment he made to A-4's sale price was to adjust it upward by a total of $35 to take into account the ranch's superior road access and improvements. 3. Valuation of the Ranch
We are dealing here with a piece of property which has no prospect of producing any substantial amount of income. Since the property's highest and best use was for hunting and recreation, the only guide as to its value is the price at which comparable property sold at that time. We think both White's and Anderson's appraisals need adjustment. Generally, the highest and best use of White's comparables, W-1, W-2, and W-3, corresponded more closely with the ranch's highest and best use than did Anderson's comparables, A-1, A-2, and A-3. Since neither expert considered their fourth properties really comparable, we will not use them in making our finding. Although A-1 had potential *343 for use for recreation and hunting purposes, the high hill located on it made it a desirable location for a house which would take advantage of the view of the countryside. The highest and best use of A-2, since it was shaped in the form of a long rectangle and bordered a paved road, was for subdivision purposes. Its usefulness for hunting was limited because of its proximity to the road. Although similar in certain respects, A-3 has a different terrain generally unlike the ranch. Since Anderson's comparable properties wer usable for other purposes than hunting and recreation and since we think he assigned an excessive amount to the ranch's improvements, it is our opinion Anderson's appraisal should be adjusted downward. We think it necessary, however, also to adjust White's appraisal upward. White was altogether too pessimistic in evaluating the ranch. Its soil overburden, rock outcroppings, vegetation, and terrain, except for certain areas which were overrun with "white brush," are such that the land can support animals and game so as to make the ranch suitable for recreation and hunting. Considering this highest and best use, White placed undue emphasis on the poor condition *344 of the ranch's fences and improvements. At trial, White testified at great length on the soil overburden, rock outcroppings, topography, and improvements of his comparables. It is uncertain whether he intended this testimony to show that his comparables were not similar in highest and best use to the ranch or whether he intended to show that they were superior for recreation and hunting. In either case, we do not think the purported differences in physical characteristics support the large discounts which White made in the sales prices of W-1 and W-2. In addition, since the sales of W-1 and W-2 occurred considerably prior to decedent's death, it is our opinion that White was in error in not adjusting their sales prices for appreciation. It would have been more useful had White used sales closer in time to the evaluation date. We will follow White's lead and also not rely on the sale of W-4 since it was unrelated in usage. Likewise, we do not give much weight to the sale of W-3 in light of the fact that although the major part of the land was unimproved scrub land like the ranch, a significant part of the property was cleared land, unrelated to the agreed highest and best use.
*345 Based on all the evidence and the opinions of the experts, it is our opinion that the value of the ranch on June 7, 1974, the date of decedent's death, was $175,500, or $300 per acre, using an aggregate acreage of 585 acres. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. /↩ The rental received under the lease was negligible, and neither one of the experts rely upon the rental income proceeds as a basis for their value estimates.