**John F. NUTT and Eileen M. Nutt, Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 18950, 18951.**

United States Court of Appeals
Ninth Circuit.

Oct. 1, 1965.

Rehearing Denied Nov. 9, 1965.

William Lee McLane, Nola McLane, Thaddeus Rojek, McLane & McLane, Washington, D. C., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, David I. Granger, and John B. Jones, Jr., Acting Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for respondent.

Before CHAMBERS, POPE and JERTBERG, Circuit Judges.

CHAMBERS, Circuit Judge:

John and Eileen Nutt, husband and wife, residents of Eloy, Arizona, are farmers. They seek review here of twin decisions of the Tax Court adverse to

them. In August, 1955, as the cotton harvesting season was approaching they formed two Arizona corporations. One was Rancho Tierra Prieta and the other was Black Land Farms, Inc.

To Tierra Prieta, they promptly transferred about 1,150 acres of land owned in fee as community property under the laws of Arizona. Along with it went the cotton crop. The crop was worth far more than the land because the Nutts retained their wells and well sites upon which the annual crops were dependent for irrigation water. As consideration for the sale, a nominal payment of cash was made and large purchase money notes and mortgages were executed. In due course, the notes were paid and the mortgages discharged. No part of the sale price was represented by corporate stock of Tierra Prieta. However, 152 shares of stock were issued in exchange for new money paid it. Apparently, John Nutt wrote a check for $7,500 and received 75 shares of common stock with par value of $100 per share. Likewise, Eileen Nutt did the same thing and received the same number of shares. Norman Nupen, the family bookkeeper, and Charles N. Walters, their lawyer, each received one share of preferred nonvoting stock, par value. They seem to have paid a hundred dollars each.[1] The directors were John Nutt, Eileen Nutt and Nupen. At this point, it is apparent the taxpayers were seeking to avoid a tax free transfer into the corporation and were seeking to get the potential substantial profit on the cotton crop into capital gains rather than be left with high federal income tax brackets. This is fine if it works, bad if it does not.

In a similar arrangement, with variations as to capital structure, the taxpayers, John and Eileen, sold their lessees' side of short term farm leases they held on neighbors' lands to Black Land. The unharvested crop went along with the leases. The leases were appraised at little more than the value of the growing crops.

The taxpayers would treat a sale of a leasehold with a growing crop the same as the sale of fee land with a growing crop, giving capital gains tax treatment to the entire purchase price received by the seller.[2] The argument is well put together, but we hold that our previous decision in Bidart Bros. v. United States, 9 Cir., 262 F.2d 607, cert. den. 359 U.S. 1003, 79 S.Ct. 1141, 3 L.Ed. 2d 1031, completely precludes petitioners here and we are unable on the leaseholds sold to Black Lands to distinguish this case as they do from Bidart.

Now we must return to Tierra Prieta, the commissioner and the Tax Court having charged the Nutts individually with the profit on the cotton crops as ordinary income. (The same was done on Black Land.) The Nutts for the years here in question filed separate tax returns, each taking half of the income as his, a rather common and permissible practice in community property states such as Arizona.

One reason given by the commissioner and the reason assigned by the Tax Court was that the taxpayers, John and Eileen, had a right to reacquire the land the

1. Among the exhibits in the record, one finds a duplicate deposit ticket of the First National Bank of Arizona, Eloy office, dated August 26, 1955, listing checks deposited as follows:

| | |
|---|---|
| J. F. Nutt | $7,500.00 |
| Eileen Nutt | 7,500.00 |
| Chas. Walters | 100.00 |
| N. C. Nupen | 100.00 |

These amounts are contemporaneous with and correspond exactly to the amounts of the respective stock subscriptions of the four individuals.

2. Sec. 1231 of the Internal Revenue Code of 1954 provides for capital gains treatment on the sale of certain property used in a trade or business and with reference to crops subsection (b) (4) thereof says:

"(b) (4) **Unharvested crop.**—In the case of an unharvested crop on land used in the trade or business and held for more than 6 months, if the crop and the land are sold or exchanged (for compulsorily or involuntarily converted) at the same time and to the same person, the crop shall be considered as 'property used in the trade or business.'"

crops were on directly or indirectly, and had thus run afoul of Regulation 1.1231–1(f) [3] under the Income Tax Code of 1954.

However, most of the commissioner's pitch before the Tax Court was that the transaction was a sham and should be disregarded. He produced some pretty good evidence on the point. But the Tax Court found against him on that, and he has not petitioned here for review. Much of the government's brief is devoted to argument of the shallowness of the transactions. But the point was lost before the Tax Court and the point is gone.

Absent the husband and wife situation, the commissioner does not suggest that two chummy equal "partners," owning as tenants in common the land that was transferred to Tierra Prieta, assuming bona fides and no sham, could not have received capital gains treatment on the transaction. And, we think such persons could have obtained capital gains treatment.

■ What is really missing from the whole voluminous record, the opinion of the Tax Court, and the briefs here is how was the stock of the corporations owned and what were the incidents of such ownership. We would not accept the common-law concepts of the husband being the master of the house and of his wife's property or the notion that because Mrs. Nutt was the wife it could be presumed she would always do what Mr. Nutt wanted done. We know the presumption that that which is acquired during coverture in a community property

state is presumed to be community property and we know the exceptions.[4] But here on the sketchy record, the stock certificates of John and Eileen could have been separate property of each. Or both certificates could have been community property. And there are other combinations. If the certificate in the name of Eileen was community property, did John have a legal right to tell her how to vote it? Could he dispose of that certificate?[5] All of these may be Arizona legal niceties. It is evident that the facts are yet explorable, and we hold we are justified in asking the Tax Court to find out the facts on the stock ownership and apply its concept of the Arizona law thereto. This is of great importance on Tierra Prieta and minor on Black Land.

■ We do not accept petitioners' contention that Sec. 1.1231–1(f) of the Regulations is invalid as wholly made up by the commissioner without any roots in the statute. Section 1231 of the 1954 Code, a capital gains section, had its counterpart in the 1939 Code.[6] The challenged subsection of the Regulations had its equivalent before 1954.[7] We think this is one case where the Congress in 1954, if it had not liked the regulation, would have changed it.

We think the regulation really defines what is a substantial sale. As indicated, the commissioner has lost his point on whether the transaction was a sham generally, but he still has his point on whether there was an indirect right to reacquire the land.

The case is remanded for proceedings in accordance with this opinion.

3. The regulation provides as follows:
   "(f) **Unharvested crops.** Section 1231 does not apply to a sale, exchange, or involuntary conversion of an unharvested crop if the taxpayer retains any right or option to reacquire the land the crop is on, directly or indirectly (other than a right customarily incident to a mortgage or other security transaction). The length of time for which the crop, as distinguished from the land, is held is immaterial. A leasehold or estate for years is not 'land' for the purpose of section 1231."

4. See Arizona Revised Statutes, 1956, Section 25–211.

5. Under Section 10–231 of the Arizona Revised Statutes Eileen Nutt could have disposed of the stock registered in her name. And, John Nutt could have sold the stock registered in his name.

6. See Section 117(j) (3) of the Internal Revenue Code of 1939, 1951 Amendment, Section 323, 65 Stat. 452.

7. See Treasury Regulations 118, Section 39.117(j)–1–(d).