Bijou Park Properties, Inc., a Liquidated California Corporation, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Bijou Park Properties, Inc. (Formerly Bijou Park Enterprises), a California Corporation, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 5112–64, 5113–64. Filed November 28, 1966.

*Carl A. Stutsman, Jr.,* for the petitioners.
*Michael P. McLeod* and *James J. Cotter,* for the respondent.

Tannenwald, *Judge:* Respondent determined deficiencies in income tax for the years and in the amounts as follows:

| Petitioner | Docket No. | Taxable period | Deficiency |
|---|---|---|---|
| Bijou Park Properties, Inc., a liquidated California corporation (herein referred to as Bijou 1). | 5112–64 | Sept. 1, 1959, to Dec. 31, 1959. | $562,684.92 |
| Bijou Park Properties, Inc. (formerly Bijou Park Enterprises), a California corporation (herein referred to as Bijou 2). | 5113–64 | Year ended Dec. 31, 1960. | 25,009.81 |

One of the issues has been settled by the parties. The issues remaining for decision are:

(1) Did the distribution to Bijou 2 of certain installment obligations in complete liquidation of Bijou 1 constitute a taxable disposition under section 453(d)?[1]

(2) Is Bijou 2 entitled to apply section 334(b)(2) in computing its basis in such obligations?

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Bijou 1 was organized as a California corporation on June 2, 1949. It filed its Federal income tax return for its taxable period involved herein with the district director of internal revenue at San Francisco, Calif.

Bijou 2 was organized as a California corporation on November 10, 1959. It filed its Federal income tax return for its taxable period involved herein with the district director of internal revenue at San Francisco, Calif.

---

[1] All references are to the Internal Revenue Code of 1954.

For some 20 years prior to the incorporation of Bijou 1, John E. Keller (hereinafter referred to as Keller, Sr.) had been active in subdividing, selling, and managing real estate in the Lake Tahoe area. Bijou 1 was organized by Keller, Sr., to engage in this same business. The company originally issued 60 shares of stock in exchange for certain land contracts. In 1959, Keller, Sr., owned 59 of these shares.[2] Martha Ellen Frisbie, his daughter, owned the other share.

Bijou 1 was engaged in the business of selling land ranging from 50-foot lots to 10-acre parcels, all on long-term contracts averaging in excess of 50 years and providing for nominal downpayments, small monthly payments, and retention of title in the seller until the contract should be paid in full. No interest was charged; rather, the contract price reflected an interest factor. Income from these contracts was reported on the installment method.

By 1959 Bijou had sold all of its land, and its assets consisted principally of the long-term, deferred-payment contracts. Each contract precluded the purchaser from prepaying the obligation and reserved title in the seller until the price was paid in full. Because the land, in most cases, had substantially increased in value, a number of purchasers were seeking to compel Bijou 1 to accept prepayment and to transfer title to the purchaser. To secure his future and to avoid potential tax problems, Keller, Sr., refused to accept such prepayments and resisted court actions brought by the purchasers to compel him so to do.

By 1959, Keller, Sr., was 74 years old, in failing health, and anxious to sell the business. He had discussions with his adopted son James R. Keller (hereafter referred to as Keller, Jr.) and his son-in-law, Charles R. Frisbie (hereafter referred to as Frisbie), concerning a possible sale of the stock of Bijou 1. Frisbie and Keller, Jr., planned to accept prepayments on the contracts and to use the proceeds to develop other properties.

Keller, Jr., had actively participated in the business of Bijou 1 since 1956. Frisbie was a professional appraiser, experienced in appraising various kinds of property, including ranch lands, commercial property, specialty properties, residential properties, and multiple-residential areas. He had testified as a witness on appraisal matters in various courts and had had occasion to determine the value of contracts and obligations as distinguished from pieces of physical real property. Frisbie had personal knowledge of the Keller, Sr., operation and also was familiar with the properties in question.

Frisbie and Keller, Jr., offered $700,000 for the Bijou 1 business. The offer was based on a present worth valuation made by Frisbie

---

[2] The stipulation of facts so states. However, Margaret Keller testified that her husband owned 30 shares while she owned 29. The discrepancy is not material to the issues before us.

of the long-term contracts held by Bijou 1, using a discount factor of 7 percent.

Keller, Sr., rejected the offer, believing that $800,000 would be a more reasonable figure. Thereupon, Frisbie reevaluated the contracts. This time he took several of the very long term contracts, some being 150 years in duration, and assumed that they would pay out in 20 years. Although there was no guarantee of receiving prepayments, he felt that such a possibility was likely in light of the rapid growth of the area and in light of the desire of purchasers to free themselves from certain land-use restrictions imposed by the contracts. Based on the new computations, Frisbie and Keller, Jr., offered $800,000 for the stock of Bijou 1. This offer was accepted at some time prior to December 1959.

To effectuate the stock purchase, it was determined that a new corporation would be formed by Keller, Jr., and Frisbie. This corporation would purchase the stock of Bijou 1, after which Bijou 1 would be liquidated into its new parent.

The new corporation, originally called Bijou Park Enterprises, and referred to herein as Bijou 2, was organized on November 10, 1959. It applied on November 25, 1959, to the California commissioner of corporations for a permit to issue 100 shares each to Frisbie and Keller, Jr. The permit was granted on December 3, 1959. On December 4, 1959, Bijou 2 issued certificate No. 1 and certificate No. 2 to Keller, Jr., and Frisbie, respectively, for 100 shares each of $10 par value stock.

The board of directors of Bijou 2 met on December 4, 1959, and authorized, *inter alia*, the borrowing of funds for the downpayment and the purchase of the stock of Bijou 1. On the same date, Bijou 2 agreed with the shareholders of Bijou 1 to buy all the stock of Bijou 1.

The purchase agreement set a price of $800,000, payable $50,000 down and the balance at the rate of $3,000 per month. In addition, one-half of any accelerated land contract payments received by Bijou 2 were to be applied to reduce the unpaid balance. The purchase agreement called for no interest payments. It also prohibited the paying of any dividends prior to payment for the stock of Bijou 1. The purchase agreement stated that all the stock in Bijou 2 was owned by Keller, Jr., and Frisbie. It further provided that the shares of Bijou 2 were to be pledged with the sellers to secure payment of the full purchase price, that no additional shares were to be issued by Bijou 2 nor any change made in its capital structure without the consent of the sellers, that the California commissioner of corporations was to be the escrow holder of the Bijou 2 shares, and that he was to be notified of the agreement and requested not to make any transfers of the shares inconsistent with the undertakings in the agreement.

On the following day, December 5, Bijou 2 canceled the original certificates and issued certificates Nos. 3 and 4 for 99 shares each to Frisbie and Keller, Jr. Certificate No. 5 for 2 shares was issued in the name of June Piedemont, an employee of both corporations. These certificates were backdated to December 4, 1959.

June Piedemont first came to work for Bijou 1 in 1951 as a secretary. She handled all the collections and bills of Bijou 1. She made bookkeeping entries and worked with the accountant. She continued with Bijou 1 until 1959, and when Bijou 2 was formed she did the same work for it. On the forming of Bijou 2, she was elected secretary-treasurer.

Bijou 2 obtained the $50,000 downpayment called for in the December 4 purchase agreement by borrowing the funds from the Union Safe Deposit Bank, Stockton, Calif. Certificates 3, 4, and 5 were delivered to the bank as security. Keller, Jr., and Frisbie, but not June Piedemont, acted as guarantors. June Piedemont never had possession of the 2 shares except momentarily in 1964 when they were sent to her for endorsement.

Pursuant to the December 4 purchase agreement, Bijou 2 acquired all the issued and outstanding stock of Bijou 1. On December 7, 1959, Bijou 2 adopted a plan of complete liquidation of Bijou 1. Thereafter all of the assets of Bijou 1 were distributed to Bijou 2 in accordance with that plan. At all times Bijou 2 owned all of the issued and outstanding shares of Bijou 1 acquired by Bijou 2 during a period of not more than 12 months. No distribution was made to Bijou 2 with respect to the stock of Bijou 1 before the adoption of the plan of liquidation.

Also on December 7, 1959, Bijou 2 changed its name to Bijou Park Properties, Inc., the same name used by Bijou 1. From such date, Bijou 2 operated in the same facilities and under the same name as had Bijou 1.

Initially, none of the shareholders of Bijou 2 paid for his stock. Keller, Jr., and Frisbie each eventually paid for his respective 99 shares. June Piedemont never paid for the 2 shares issued in her name.

Subsequent to December 1959, Bijou 2 carried on the business previously carried on by Bijou 1. In addition, it engaged in other real estate activities in the Lake Tahoe area.

The plan for the formation of Bijou 2, the designation of its shareholders, the acquisition by it of all the issued and outstanding shares of Bijou 1, and the complete liquidation of Bijou 1 were devised and implemented against a background of advice of counsel as to the various tax consequences, including the potential effect of the attribution rules of section 318(a) on the availability of an increased basis of assets to Bijou 2 under section 334(b)(2).

In 1963, Bijou 2 acquired an interest in El Tahoe Cabins. June

Piedemont had invested in this property but was unable to meet further financial obligations in respect thereto. At that time she agreed to endorse the 2 shares of Bijou 2 issued in her name to Keller, Jr. About that time, she ceased working for Bijou 2 and resigned from her position as secretary-treasurer. Also, at that time she moved to Carson City, Nev.

On August 11, 1964, June Piedemont endorsed the 2 shares in her name to Keller, Jr. Frisbie objected to the transfer because it gave Keller, Jr., voting control of the stock. Consequently, on the same date, the 2 shares were transferred to Harvey R. Fowler, also known as Raymond Keller, another adopted son of Keller, Sr. Because Harvey was not thought by Frisbie to be independent, the 2 shares were transferred to Don Stewart, an officer of Union Safe Deposit Bank of Stockton. Fowler and Stewart were only nominees.

The assets and liabilities distributed to Bijou 2 in the liquidation of Bijou 1 were as follows:

### ASSETS

| | |
|---|---:|
| Cash in bank—general account | $2,208.49 |
| Cash in bank—reserve account | 11,891.91 |
| Accounts receivable—general | 384.00 |
| Contracts receivable | 1,221,772.43 |
| Accounts receivable—county taxes | 6,630.45 |
| Notes receivable—general | 2,303.00 |
| Notes receivable—John E. Keller | 4,689.80 |
| Unexpired insurance | 666.31 |
| Equipment | 1,124.59 |

### LIABILITIES

| | |
|---|---:|
| Accounts payable | $631.93 |
| Accrued State payroll taxes | 14.80 |
| Accrued FICA tax | 20.00 |
| Accrued employee withholding tax | 73.80 |
| Accrued property taxes | 9,212.88 |
| Provision for Federal income tax | 3,179.40 |

The distribution was recorded on the books of Bijou 2 as follows:

| | | |
|---|---:|---:|
| Cash | $14,100.40 | |
| Notes and accounts receivable | 14,007.25 | |
| Unexpired insurance | 666.31 | |
| Equipment | 12,500.00 | |
| Contracts receivable | 771,858.85 | |
| Accounts payable | | $740.53 |
| Notes payable | | 800,000.00 |
| Accrued property tax | | 9,212.88 |
| Federal income tax | | 3,179.40 |

The basis of the installment contracts as of the liquidation date in the hands of Bijou 1 was $113,592.89.

Bijou 2 allocated $771,858.85 of the purchase price of the stock of Bijou 1 to the installment contracts.

Bijou 1 reported no gain from the disposition of unrealized receivables.

Bijou 2 reported in 1960 collections received on the installment contracts on the basis of cost recovery.

### ULTIMATE FINDINGS OF FACT

Bijou 2 was a viable separate entity entitled to recognition for tax purposes. The acquisition by Bijou 2 of the shares of Bijou 1 and the liquidation of Bijou 1 did not have as their principal purpose the evasion or avoidance of Federal income tax.

June Piedemont was not a bona fide shareholder of Bijou 2. She at all times held the 2 shares registered in her name as nominee for Keller, Jr., and Frisbie.

Keller, Jr., was, at the time of the acquisition of the shares of Bijou 1 by Bijou 2, the owner of at least 50 percent of the issued and outstanding shares of Bijou 2.

### OPINION

In broad outline, this case presents the fascinating and challenging question whether the interplay of sections 332(a), 334(b)(2), and 453 (d)(4)(A)[3] produces a "loophole" which permits Bijou 1 to avoid

---

[3] SEC. 332. COMPLETE LIQUIDATIONS OF SUBSIDIARIES.

(a) GENERAL RULE.—No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation.

SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(b) LIQUIDATION OF SUBSIDIARY.—

(2) EXCEPTION.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted—

(i) on or after June 22, 1954, and

(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction) ; and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a period of not more than 12 months,

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. * * *

SEC. 453. INSTALLMENT METHOD.

(d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—

(4) EFFECT OF DISTRIBUTION IN CERTAIN LIQUIDATIONS.—

(A) Liquidations to which section 332 applies.—If—

(i) an installment obligation is distributed by one corporation to another corporation in the course of a liquidation, and

(ii) under section 332 (relating to complete liquidations of subsidiaries) no gain or loss with respect to the receipt of such obligation is recognized in the case of the recipient corporation.

then no gain or loss with respect to the distribution of such obligation shall be recognized in the case of the distributing corporation. * * *

[The amendments to secs. 334(b)(2) and 453(d) made by Pub. L. 89–809, 89th Cong., 2d Sess., sec. 202 (b) and (c), are not applicable to the years herein involved.]

tax on the disposition of its installment obligations by virtue of section 453(d)(4)(A) and Bijou 2 to reduce its taxable income through an increased basis for such obligations in its hands by virtue of section 334(b)(2). Interstitially, there is the further question whether the application of the attribution rules as required by section 334(b)(3)[4] denies Bijou 2 the benefits of section 334(b)(2).

Petitioners boldly assert that the loophole exists and that they are clearly entitled to the benefits. Respondent, on the other hand, in a valiant effort to overcome what appears to be the clear language of the applicable sections, attacks petitioners' assertion from every side. Reflecting the understandable horror with which he views the prospect of a substantial tax benefit, respondent's arguments uncertainly alternate between (1) agreeing that Bijou 1 has not made a taxable disposition of the installment obligations but denying an increased basis to Bijou 2 and (2) claiming that Bijou 1 has made a taxable disposition but agreeing that Bijou 2 is entitled to an increased basis. His weapon is the blunderbuss and his ammunition includes statutory construction of the particular sections, section 269, and an allegation of such lack of business purpose for Bijou 2 as to justify its being ignored.

We can readily dismiss respondent's claim that Bijou 2 lacked business purpose and therefore should be disregarded. We have found as a fact that Bijou 2 was a viable entity for tax purposes. It was validly organized. Leaving aside any question of attribution, it had different stockholders from those of Bijou 1. It carried on a business and continued to do so at the time of the trial herein. We have found that its business activities went beyond those carried on by Bijou 1 prior to the liquidation, although it would appear that this would not be an essential prerequisite. Cf. *United States* v. *M.O.J. Corporation*, 274 F. 2d 713 (C.A. 5, 1960); Rev. Rul. 60–262, 1960–2 C.B. 114. Bijou 2 therefore had substance, with the result that the cases involving "disappearing" corporations, heavily relied upon by respondent, are clearly distinguishable. E.g., *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *Blueberry Land Co.*, 42 T.C. 1137 (1964), affd. 361 F. 2d 93 (C.A. 5, 1966).

---

[4] SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

  (b) LIQUIDATION OF SUBSIDIARY.—

    \*     \*     \*     \*     \*     \*     \*

    (3) PURCHASE DEFINED.—For purposes of paragraph (2)(B), the term "purchase" means any acquisition of stock, but only if—

      (A) the basis of the stock in the hands of the distributee is not determined (i) in whole or in part by reference to the adjusted basis of such stock in the hands of the person from whom acquired, or (ii) under section 1014(a) (relating to property acquired from a decedent),

      (B) the stock is not acquired in an exchange to which section 351 applies, and

      (C) the stock is not acquired from a person the ownership of whose stock would, under section 318(a), be attributed to the person acquiring such stock.

[This section was amended in respects not material herein by Pub. L. 89–809, 89th Cong., 2d Sess., sec. 202(a).]

Turning to the statutory provisions themselves, there obviously was a complete liquidation of Bijou 1 into Bijou 2. Clearly this part of the transaction falls within the ambit of section 332(a). Nothing in section 334 requires a contrary conclusion. Indeed, that section by its terms is applicable to section 332 liquidations. Section 334(b)(2) merely provides for a different treatment of basis in the limited situation where one corporation purchases all of the stock of another corporation 'and then liquidates the latter. It is, however, only an exception to the *basis* rule normally applicable to property received by one corporation in complete liquidation of another corporation; it does not negate the liquidation or otherwise require the conclusion that the liquidating corporation disposed of the assets distributed in a taxable transaction. Cf. *Dallas Downtown Development Co.*, 12 T.C. 114 (1949).

In enacting the 1954 Code in its original form, Congress exhibited an acute awareness of the problems inherent in the disposition of installment obligations by a corporation during the course of liquidation. Thus, section 337 dealt specifically with such obligations as well as with the sale or exchange of property generally where section 334 (b) (1) or (2) was involved. Section 336 specified that "Except as provided in section 453(d) (relating to the disposition of installment obligations), no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation." With respect to section 332 or 337 liquidations, section 453(d)(4) carefully carved out exceptions to the general rule of recognition. Amendments to section 453(d)(4)(A) and (B)—albeit enacted subsequent to the years involved herein—further illustrate the legislative meticulousness with which limited taxability has been imposed on the distribution of installment obligations in corporate liquidations and specifically where the basis of property in the hands of the distributee corporation is determined under section 334(b)(2). Sec. 13(f)(5), Pub. L. 87–834 (Oct. 16, 1962); sec. 231(b)(5), Pub. L. 88–272 (Feb. 26, 1964); sec. 1(b)(2), Pub. L. 88–484 (Aug. 22, 1964); cf. *Paragon Jewel Coal Co.* v. *Commissioner*, 380 U.S. 624, 636 (1965).

We are not impressed with respondent's attempt to use section 269 to deny to Bijou 1 the nonrecognition benefits of section 453(d)(4) (A). Indeed, we have found that the acquisition of Bijou 1 did not have as its principal purpose the "evasion or avoidance of Federal income tax." Moreover, the benefit involves nonrecognition of income and not a "deduction, credit or other allowance." *Sam Siegel*, 45 T.C. 566 (1966); *John F. Nutt*, 39 T.C. 231 (1962), remanded on other grounds 351 F. 2d 452 (C.A. 9, 1965).

We hold that, in view of the scalpel-like precision with which Congress has fashioned the applicable statutory provisions, Bijou 1 did

not realize gain or loss on the distribution of the installment obligations in complete liquidation to Bijou 2.[5] Our conclusion is confirmed by the recent action of Congress in amending section 453(d) to provide prospectively that a distribution of installment obligations in a section 334(b)(2) liquidation constitutes a taxable disposition by the distributing corporation. Pub. L. 89–809, 89th Cong., 2d Sess., sec. 202(c); see S. Rept. No. 1707, 89th Cong., 2d Sess., pp. 60–61 (1966).

Petitioners insist that the same analytical difficulties inhere in respondent's assertion that Bijou 2 is not entitled to an increased basis for the installment obligations in its hands.[6] They point out that section 334(b)(2) on its face contains no exception with respect to the determination of such basis and that the infusion of the attribution rules into section 334(b)(2) indicates that Congress was aware of the necessity of drawing, and in fact drew, precise lines to limit the use of section 334(b)(2) in obtaining unwarranted tax benefits.[7]

Nor do petitioners agree with respondent's assertion that section 1001(d)[8] requires a contrary result. They emphasize that that section, which by its terms deals with the taxability of "an installment *payment*," is designed to protect the right to report on the installment method.[9] With respect to the applicability of section 269, petitioners note that the claimed increased basis to Bijou 2 results from a transaction which was specifically encompassed by a particular section of the Internal Revenue Code, namely, section 334(b)(2). Cf. I.T. 3757, 1945 C.B. 200. In any event, we have found that the principal purpose which motivated the liquidation of Bijou 1 and the acquisition of its assets by Bijou 2 was not "evasion or avoidance of Federal income tax."

Based upon these arguments petitioners contend that we should decree a loophole and remit respondent to the legislative arena for relief. See S. Rept. No. 1707, *supra;* cf. *Hanover Bank* v. *Commis-*

---

[5] We are not faced with contrary legislative history or surplus statutory language as was the court in *J. C. Penney Co.* v. *Commissioner*, 312 F. 2d 65 (C.A. 2, 1962), affirming 37 T.C. 1013 (1962).

[6] Respondent does not question the amount of the $800,000 purchase price for the Bijou 1 shares allocated by Bijou 2 to the installment obligations. In this connection, we note that the petition in docket No. 5113–64 admits that there was goodwill attributable to the name Bijou Park Properties, Inc. (the name of Bijou 1 until liquidation), but Bijou 2 did not see fit to allocate any portion of the purchase price thereto.

[7] We also note that in sec. 381 Congress again showed its capacity to use the scalpel where sec. 334(b)(2) liquidations were involved but excluded the *receiving* corporation in such liquidations from the use of carryovers, including the carryover of the basis of installment obligations. Sec. 381(c)(8).

[8] SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(d) INSTALLMENT SALES.—Nothing in this section shall be construed to prevent (in the case of property sold under contract providing for payment in installments) the taxation of that portion of any installment payment representing gain or profit in the year in which such payment is received.

[9] See H. Rept. No. 486, 67th Cong., 1st Sess., p. 18 (1939), 1939–1 C.B. (Part 2) 210; cf. S. Rept. No. 52, 69th Cong., 1st Sess., p. 19 (1939), 1939–1 C.B. (Part 2) 346; H. Rept. No. 356, 69th Cong., 1st Sess., p. 32 (1939), 1939–1 C.B. (Part 2) 363.

*sioner*, 369 U.S. 672 (1962). However, we find it unnecessary to resolve the issue thus presented because it is clear on the facts herein that Bijou 2's ship flounders on the reef of the attribution provisions of section 334(b)(3). Subparagraph (C) of that section excludes from the definition of "purchase" (with the result that a change of basis under section 334(b)(2) is precluded) an acquisition of stock from "a person the ownership of whose stock would, under section 318(a), be attributed to the person acquiring such stock."[10] If at least one share of the stock registered in June Piedemont's name is considered as owned by Keller, Jr., the latter would then own 50 percent or more of the stock of Bijou 2. Petitioners correctly concede that, under such circumstances, section 318(a) would require the conclusion (1) that Keller, Jr., constructively owned all of the stock of Bijou 1 owned by his mother and father, (2) that Bijou 2 would be deemed to own constructively all of such stock, and (3) that therefore the provisions of subparagraph (C) of section 334(b)(3) would apply.[11]

Petitioners contend that June Piedemont was the bona fide owner in her own right of the 2 shares of Bijou 2. Respondent argues that she was no more than a joint nominee for Keller, Jr., and Frisbie. We agree with respondent.

When Bijou 2 made application to the California authorities for permission to issue its shares, no reference was made to June Piedemont. The application covered 100 shares each to be issued to Keller, Jr., and Frisbie, and on December 4, 1959, certificates were in fact issued in that fashion. It was only on the next day that these certificates were canceled and three new backdated certificates were issued, 99 shares each to Keller, Jr., and Frisbie and 2 shares to June Piedemont.[12]

---

[10] The parties originally stipulated that "Bijou No. 2 owned all of the issued and outstanding stock of Bijou No. 1, acquired by Bijou No. 2 in a purchase as defined in subparagraph (3) of Section 334(b)(2) [sic] during a period of not more than 12 months."

It is at least questionable whether this stipulation was intended to be limited to compliance with the 12-month requirement of sec. 334(b)(2)(B). The fact that attribution was a major issue at the trial and on brief indicates that such is the case. In any event, we consider that petitioner has abandoned any reliance on the stipulation. See *Adolph Weinberg*, 44 T.C. 233 (1965), on appeal (C.A. 9, May 20, 1966); *William Ernest Seatree*, 25 B.T.A. 396 (1932), affirmed on other grounds 72 F. 2d 67 (C.A.D.C. 1934). We therefore need not consider whether, absent such limited construction or abandonment, we would nevertheless not be bound by the stipulation on the ground that it involves an issue of law. See, e.g., *Davis* v. *Commissioner*, 241 F. 2d 701 (C.A. 7, 1957), reversing a Memorandum Opinion of this Court (dictum); *Victor G. Marquissee* et al., 11 B.T.A. 334 (1928), affirmed sub nom. *Lewis* v. *Commissioner* on other grounds 47 F. 2d 32 (C.A. 3, 1931); *Ohio Clover Leaf Dairy Co.*, 8 B.T.A. 1249 (1927), affirmed per curiam 34 F. 2d 1022 (C.A. 6, 1929), certiorari denied 280 U.S. 588.

[11] The same process cannot be utilized to attribute the shares of Bijou 1 owned by Keller, Sr., and his wife to Frisbie via their daughter and Frisbie's wife, Martha, because of the prohibition against double family attribution contained in sec. 318(a)(5)(B).

[12] There is no direct evidence as to the precise date on which Bijou 2 acquired the shares of Bijou 1. However, the 1959 tax return of Bijou 1 states that Bijou 2 became a 100-percent shareholder on Dec. 4, 1959. On that day, the shareholders of record of Bijou 2 were Keller, Jr., and Frisbie. Based on these facts alone, the attribution rules of sec. 334(b)(3) would clearly be applicable.

The agreement to purchase the Bijou 1 shares, executed on December 4, 1959, explicitly stated that Keller, Jr., and Frisbie were the only shareholders. Petitioners claim that the reason for this and the delay in making June Piedemont a shareholder was that Keller, Sr., would have objected, but no plausible reason was presented as to why he would have objected. The agreement itself, if not expressly, at least by clear implication, prohibited the entrance of any new shareholders without the consent of Keller, Sr., and his wife.[13]

There was never any prospect of income from Bijou 2 in respect of the shares, since the agreement with Keller, Sr., and his wife prohibited the payment of dividends until the purchase price of the Bijou 1 shares was paid in full. Indeed, this fact and the added fact that the shares in June Piedemont's name represented only 1 percent of the issued and outstanding shares belies petitioners' contention that she received the shares as an incentive to stay with Bijou 2. The record indicates that June Piedemont never realized anything concrete from the subsequent disposition of her shares; there was some vague, general, and unconvincing testimony that she subsequently transferred her shares to Keller, Jr., in connection with certain financial difficulties in which she found herself but the details were not satisfactorily explained. Indeed, it is significant that, although the 2 shares were transferred to Keller, Jr., it was Bijou 2 that bailed her out of such financial difficulties as may have existed. Of even greater significance is the fact that the subsequent record owners of the 2 shares, Harvey R. Fowler and Donald Stewart, were unquestionably nominees for Keller, Jr., and Frisbie.

June Piedemont never had possession of the certificate representing the 2 shares. At no time did she exercise any of her rights as a shareholder, other than to sign documents required to be signed by shareholders of record.

Moreover, she never paid for the shares.[14] The reason given was that the amount involved was too small. We agree with petitioners that the fact that the shares may have been issued or transferred to her by way of gift rather than for value (as to which petitioners' evidence was conflicting) is not in and of itself determinative. But we think it not unreasonable to take into account her failure to pay in determining the bona fides of her alleged ownership—especially where

---

[13] Par. 3 of the agreement provided that the stock of Bijou 2 would be pledged to Keller, Sr., and his wife to secure payment of the purchase price, that Keller, Jr., and Frisbie "agree not to issue additional stock, nor to otherwise change the capital structure of Bijou" without the consent of Keller, Sr., and his wife, and that the California commissioner of corporations as the escrow holder of the shares was to be advised of the pledge agreement and requested "to make no *transfer* of said stock, if it is inconsistent therewith." (Emphasis added.) In fact, the escrow was never established.

[14] We consider her failure to execute the guaranty of the bank loan of little importance since it would have added nothing of substance.

such ownership assumed such importance in the determination of tax consequences of which the parties were fully aware.

In view of the equal ownership of shares by Keller, Jr., and Frisbie, June Piedemont's ownership, if it existed, would have controlled Bijou 2. We find it hard to believe that Keller, Jr., and Frisbie would have intentionally put a person who was nothing more than a secretary-bookkeeper in that position. It seems more likely that they considered her their nominee to do their bidding or to abstain from exercising their rights in the event that a dispute should arise between them. The fact that Frisbie strongly objected when she transferred the certificate representing the shares to Keller, Jr., and insisted that the shares be transferred to an agreed nominee points in this direction. We are left with the firm conviction that June Piedemont was herself a nominee and that such rights as she had in the 2 shares should be attributed to Keller, Jr., in sufficient degree to make section 334(b)(3) applicable.

Petitioners have failed to include some essential tiles in their mosaic of tax planning. We hold that Bijou 2 is not entitled to the benefits of section 334(b)(2) and that its basis in the installment obligations is the same as it was in the hands of Bijou 1.[15]

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

[15] Bijou 1 erroneously reported income in respect of certain installment payments received in December 1959 which should have been reported by Bijou 2. The latter's 1959 taxable year is not before the Court. Bijou 1 has stated that it will make no claim for any taxes erroneously paid in this regard.