**PETER PAN SEAFOODS, INC.,**
**Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 22352.**

United States Court of Appeals
Ninth Circuit.

Oct. 15, 1969.

James W. Johnston (argued), Bryant R. Dunn and William R. Smith, of Graham, Dunn, Johnston & Rosenquist, Seattle, Wash., for appellant.

Carolyn Just (argued), Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Loring W. Post, Attys., Washington, D. C., for appellee; Eugene G. Cushing, U. S. Atty., Charles W. Billinghurst, Asst. U. S. Atty., Tacoma, Wash., of counsel.

Before JERTBERG, DUNIWAY and CARTER, Circuit Judges.

DUNIWAY, Circuit Judge:

Peter Pan Seafoods, Inc. appeals from a judgment which denied its claim for refund of federal income taxes. The district court's opinion is found at 272 F. Supp. 888. Our statement of the facts is more abbreviated than that of the district court, from which further details may be ascertained. In its refund action Peter Pan sought to recover $286,886.26 assessed and collected by the Commissioner of Internal Revenue for the taxable years ending March 31, 1960, and March 31, 1961. The Commissioner's assessment was based upon recomputation of income for the tax year ending March 31, 1957, which thereby reduced operating losses that could otherwise have been carried forward. Involved are the consequences of an acquisition by another company of two mortgage notes previously issued by the taxpayer. We reverse.

The Commissioner successfully contended below that (1) the notes were in substance acquired by the taxpayer and that, therefore, the taxpayer realized income as a result of cancellation of its own indebtedness, and (2) the operating loss carry-forward deductions claimed by the taxpayer were disallowable under Section 269(a) of the Internal Revenue Code of 1954 as an acquisition made to evade income tax.

Peter Pan Seafoods, Inc. was named P. E. Harris Company, Inc. ("New Harris") at the time of the transaction in question. New Harris is the successor corporation to P. E. Harris & Co. ("Old Harris"), a liquidated corporation. In 1950 New Harris executed two mortgage notes in a total amount of $1,668,432 for the purchase of the assets of Old Harris. Six years later, in 1956, it appeared that the notes could be purchased at a substantial discount. New Harris, through its president Nick Bez, became interested in acquiring the notes. Bez, however, was advised that if New Harris acquired the notes, it would realize income in an amount equal to the discount. Accordingly, Bez determined that it would not be feasible for New Harris to purchase the notes because the combined purchase price and tax liability would be prohibitive under the circumstances.

Bez, who was also a substantial stockholder of New Harris, then began to explore the possibility of joining with other stockholders to purchase the notes. To this end, he caused The Ajax Company to be organized and solicited other stockholders of New Harris for subscriptions for stock and notes to be issued by Ajax. The larger number (85.44%) but not all, of the stockholders of New Harris subscribed for Ajax stock and notes. The other subscribers owned no New Harris stock. With the funds so obtained ($142,228.52) and the proceeds of a bank loan ($642,000) Ajax negotiated for and acquired the mortgage notes for an aggregate net purchase price of $774,-228, early in 1957. Simultaneously, the notes were pledged by Ajax to the bank as collateral for its loan. In negotiating the bank loan to Ajax, Bez assured the bank that a substantial payment on its loan would be made in the near future. After the acquisition of the notes, payments of interest, ($66,737.58) and a substantial prepayment of principal ($400,000) thereon, were made by New Harris to Ajax. Most of these payments were then paid by Ajax to the bank, reducing its loan to $192,000. From the date of incorporation of Ajax until it acquired all of the stock of New Harris in 1959, Ajax did not engage in any business activity other than the acquisition of the notes and the negotiations

in connection with the notes, and during the relevant period the notes were its only assets, except for a small amount of cash.

The parties do not dispute the fact that Ajax did engage in certain activities during the times here relevant. These included raising a very substantial amount of money, not from New Harris, to buy the notes, the purchase of the notes, collecting payments on the notes, and partially paying the bank loan. The transaction had real economic effects. It benefitted New Harris by getting the notes into friendly hands. The shareholders of New Harris who were also shareholders of Ajax could control the possible foreclosure of the mortgages on New Harris' properties in the event of a default, thereby protecting the value of their equity in New Harris. Purchase of the notes also forestalled the potential threat posed by competitors interested in taking over New Harris by first acquiring its indebtedness. More important, although not mentioned by the district court, Ajax, by purchasing the notes at a discount, acquired the possibility of ultimately making a substantial profit if it should turn out that New Harris could pay them off. There is no contention, and no finding, that Ajax was obliged either to forego collection of the notes in full, or if it did collect, to turn over any of its profit to New Harris. And if such a finding had been made, the record would not support it.

Perhaps the strongest support for the district court's decision lies in Bez's assurance to the bank that a substantial payment would be made on account of its loan, followed as it was by a prompt prepayment by the taxpayer to Ajax on account of the principal of the indebtedness, most of which was then paid by Ajax to the bank. But there is no finding that Bez purported to, or had any authority to, or did, give that assurance on behalf of New Harris. No doubt, as president and a substantial stockholder of New Harris, he believed that he could get New Harris to make the payment that it did make. But there is no finding that New Harris' doing so was a part of

the deal. If the assurance had not been carried out, the bank's recourse would have to be against Bez, or perhaps Ajax, to which the bank's loan was made. It could not have enforced the assurance, if it was enforcible at all, against New Harris.

There is no finding that it was a part of the scheme that Ajax would refrain from enforcing the notes, or would turn them over to New Harris as a contribution to capital, or that there was any other understanding whereby New Harris would accomplish the acquisition of the notes at a discount. It is true that, through a complicated series of transactions in 1959, Ajax became the sole shareholder of New Harris and then made a capital contribution to New Harris of the unpaid portion of the notes. But the government made no effort to prove that this was the purpose, or a part of the deal, at the time Ajax was founded and purchased the notes. Apparently it could not prove such a plan. See ACF-Brill Motors Co. v. Commissioner of Internal Revenue, 3 Cir., 189 F.2d 704, 707, cert. denied, 1951, 342 U.S. 886, 72 S.Ct. 176, 96 L.Ed. 665.

The district court found that Ajax was formed primarily, but not solely, for the purpose of avoiding federal income tax to New Harris on the purchase of the notes. It relied on this tax avoidance motive plus the close relationship between stockholders of New Harris and Ajax to recast the transactions into the form of a purchase by New Harris of its own notes. The district court's alternative reliance on section 269(a) rests on the same factors. We accept the findings of fact, but we hold that the court drew improper legal conclusions from them.

1. *The transaction was not a purchase by taxpayer of its own notes.*

Under section 61(a) (12) of the Internal Revenue Code of 1954 a taxpayer that purchases its own indebtedness at a discount realizes income in the amount of the discount. New Harris, however, did not purchase its own notes. Legally, Ajax was not New Harris; le-

gally, it would not have been New Harris even if all of its stockholders were also stockholders of New Harris, each holding the same proportion of the stock of both companies. Nor were any of New Harris' funds used to acquire Ajax stock. The government's case therefore rests upon a finding that Ajax was a "conduit, agent, alter ego, tool or instrumentality" used by New Harris to draw in its own notes at a discount.

We do not doubt that the district court was correct in closely scrutinizing Ajax's activities where they had their primary genesis in a desire that New Harris not acquire a tax liability. Tax law is replete with applications of the doctrine that taxation depends upon the substance and not the form of a transaction. See e. g., Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Diggs v. Commissioner of Internal Revenue, 2 Cir., 1960, 281 F.2d 326, 330; cf. National Investors Corp. v. Hoey, 2 Cir., 1944, 144 F.2d 466. See also B. Bittker, J. Eustice, Federal Income Taxation of Corporations and Shareholders § 13.01, at 605 (2d ed., 1966). Yet tax law also recognizes that the motive of tax avoidance will not alone establish tax liability if the transaction does not do so without it. Gregory v. Helvering, supra, 293 U.S. at 469, 55 S.Ct. at 267:

> "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. * * * But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."

Where a transaction has economic substance and is economically realistic, it should be recognized for tax purposes. Tax motive alone is not the criterion for determining its legitimacy. Knetsch v. United States, 1960, 364 U.S. 361, 365 & n. 2, 81 S.Ct. 132, 5 L.Ed.2d 128; Gregory v. Helvering, supra, 293 U.S. at

470, 55 S.Ct. 266; Friedlander Corp. v. Commissioner of Internal Revenue, 5 Cir., 1954, 216 F.2d 757; Chisholm v. Commissioner of Internal Revenue, 2 Cir., 1935, 79 F.2d 14.

In this case, the district court elevated its "close scrutiny" to the point where it disregarded the actual economic impact of Ajax's activities. Ajax was not a shell as was the corporation in Gregory, supra. It raised its own funds from some of New Harris' stockholders, from some who were not New Harris' stockholders, and from a bank that had no other connection with the transaction. As we have indicated, Ajax's activity did have economic substance and notwithstanding the "tax avoidance purpose" the activity can be attributed only to Ajax and not to New Harris. The district court erred in holding otherwise. See Koppers Co., 1943, 2 T.C. 152, 158, which involved facts comparable to the present case.

The district court correctly pointed out that New Harris could have carried on precisely the same activities and thus have incurred a greater tax liability. But the fact is that New Harris chose not to do so. The further fact that the majority of New Harris stockholders, together with others, chose to form a new corporation, Ajax, to finance and carry on the activities, does not mean that the activities themselves were any the less real or economically significant.

The tax avoidance motive here is quite different from that which was present in the cases on which the government principally relies. In Court Holding Co., supra, a corporation negotiated a sale of its only asset to a third party. Having done so, it then cast the transaction in the form of a liquidating dividend to its shareholders, who then made the sale. The purpose of the form was to avoid capital gains tax to the corporation. Gregory, supra, was similar, involving a scheme whereby an individual, owning all of the stock of corporation A, got into her hands certain securities owned by corporation A by means of a paper reorganization involving the creation of cor-

poration B, the transfer of the securities to it, the issuance of its stock to the taxpayer, and its immediate liquidation. The transactions were mere drawing up and shuffling of papers. In United States v. General Geophysical Co., 5 Cir., 1961, 296 F.2d 86, the court rejected the contention of the taxpayer-corporation that it was entitled to a stepped-up basis for certain property by virtue of a transfer of the property to its major shareholders and a simultaneous repurchase from them by the corporation at an enhanced valuation. The distribution and repurchase occurred on the same day and without interruption in the corporation's control and use of the property. In Lynch v. United States, 9 Cir., 1951, 192 F.2d 718, a corporation declared a dividend in kind consisting of boxes of apples. At the same meeting at which the dividend was declared, the stockholders agreed with the corporation that the corporation would sell the apples and remit the proceeds to the shareholders. The sale then occurred in the normal course of the corporation's business. The court ignored the purported dividend and held that the corporation was taxable on the gain from the sale of the apples. This was because the real effect of the transaction was to declare a cash dividend since the corporation continued to perform the selling services, just as it would have had there been no dividend declared.

In each case on which the government relies, there was a transaction that the taxpayer wanted to complete. In each, the taxpayer did complete the transaction. In each, in order to avoid tax, the transaction was cast in a form that would avoid the tax, but the reality remained the same. The change in form was just that, and nothing more.

In the case at bar, the taxpayer would have liked to acquire its own notes, but decided not to do so because of the tax that would be incurred. But what happened thereafter was not done by the taxpayer, but by others, both in form and in substance. We know of no case that imposes a tax on a taxpayer because it elected not to enter into a taxable transaction.

In contrast to *Lynch,* in Gensinger v. Commissioner of Internal Revenue, 9 Cir., 1953, 208 F.2d 576, this court did not attribute gain to a corporation where a distribution in kind occurred without any selling activity by the corporation after the distribution had been made. Tax avoidance was just as much a motive in *Gensinger* as in *Lynch;* in each case the reality of the transaction determined its tax consequences. In *Gensinger,* the transaction was real; in *Lynch,* it was not. See also Twin Oaks Co. v. Commissioner of Internal Revenue, 9 Cir., 1950, 183 F.2d 385, 24 A.L.R.2d 466. *Cf.* B. Bittker & J. Eustice, *supra,* § 5.21, at 182–83; Scott, Taxation of Corporate Distributions in Kind, 12 Stan.L.Rev. 529, 543 & n. 60 (1960).

2. *Section 269(a) does not apply.*

The section 269(a) issue remains. Section 269(a) provides that if any person or persons acquire control of a corporation, "and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax *by securing the benefit of a deduction, credit, or other allowance which such person * * * would not otherwise enjoy,*" then the Secretary may disallow it. (Emphasis added.) The evident Congressional purpose in enacting the predecessor to section 269(a), section 129(a) of the Internal Revenue Code of 1939, was to prevent the "practice of corporations with large excess profits * * * acquiring corporations with current, past, or prospective losses or deductions * * * for the purpose of reducing income and excess profits taxes." S.Rep. No. 627, 78th Cong., 1st Sess., at 58 (1944). As the district court pointed out, technically a "deduction, credit, or other allowance" actually is in dispute here through the form of the operating loss carryover claimed by New Harris for the two tax years in question. Obviously, the operating losses would not be available in 1960 and 1961 as carryovers from 1957 if they were absorbed by income for 1957.

The statute simply does not apply to this case. The taxpayer's losses arose

from its regular business, and are totally unrelated to the transaction here under attack. The essence of the government's case is an attempt to increase the taxable income of the taxpayer for 1957. It has no effect at all on the amount or propriety of the deductions, the validity of which is conceded. It is mere happenstance that, if the taxpayer's income for 1957 were increased, the deductions would be absorbed in that year and so could not be carried forward to 1960 and 1961. The taxpayer is nevertheless entitled to them, in full, in an appropriate year, whatever be the result of this case. In comparable circumstances, the Tax Court has held that section 269 is inapplicable. See John F. Nutt, 1962, 39 T.C. 231, 250, remanded on other grounds, 9 Cir., 1965, 351 F.2d 452. See also Bijou Park Properties, Inc., 1966, 47 T.C. 207, 214; Sam Siegel, 1966, 45 T.C. 566, 578. We agree with the Tax Court.

The judgment is reversed and the matter is remanded with instructions to enter judgment for the appellant.

JAMES M. CARTER, Circuit Judge (dissenting):

The trial court's findings of fact, conclusions of law and judgment, and its opinion in 272 F.Supp. 888 correctly disposed of the case.

The judgment should be affirmed.